# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 02-3262

WARREN L. BAKER, JR. and DORRIS J. BAKER,

*Petitioners-Appellants*,

*v.*

COMMISSIONER OF INTERNAL REVENUE,

*Respondent-Appellee.*

Appeal from the United States Tax Court.
No. 599-00

ARGUED MAY 12, 2003—DECIDED AUGUST 4, 2003

Before BAUER, KANNE, and WILLIAMS, *Circuit Judges*.

BAUER, *Circuit Judge*.  The Commissioner of Internal Revenue determined a deficiency in Warren and Dorris Baker's[1] 1997 joint federal income tax return because of Baker's treatment of $38,622 in termination payments as a long-term capital gain. The Commissioner says that the termination payments were ordinary income, and

---

[1]  Dorris Baker is a party to this matter because the appellants filed a joint return. Since only Warren Baker's income is disputed in this appeal, the remainder of the opinion will refer to Mr. Baker only.

asserted a deficiency of $2,519. Baker filed a petition with the United States Tax Court seeking a redetermination of this deficiency. The Tax Court found the termination payments constituted ordinary income and upheld the Commissioner's deficiency determination. Baker appeals, and for the reasons stated herein, we affirm the Tax Court's judgment.

## BACKGROUND

Warren Baker worked as an insurance agent for State Farm Insurance Company from 1963 to 1997 and conducted business as the Warren L. Baker Insurance Agency.[2] Baker started the agency from scratch. He had no assigned customers and was responsible for developing a customer base. He selected the location of his office with State Farm's approval. He was also responsible for office expenses and for hiring and paying employees. Finally, Baker established a trust fund into which he deposited premiums collected on behalf of State Farm.

Baker's daily duties entailed soliciting applications for insurance, collecting payments, and assisting State Farm policyholders. His compensation consisted of commissions on new policies and renewals of existing policies. Over the course of thirty-four years, Baker generated a customer base of approximately 1800 households, with more than 4000 policies in force.

The terms of Baker's relationship with State Farm were governed by an Agent's Agreement. Baker could not sell, assign, or pledge the Agreement or any interest therein without prior written consent from State Farm.

---

[2] State Farm consisted of State Farm Mutual Automobile Insurance Co., State Farm Life Insurance Co., State Farm Fire & Casualty Co., and State Farm General Insurance Co.

Under the Agreement, Baker was required to operate as an independent contractor. The Agreement provided that State Farm would furnish, without charge, manuals, forms, records, and other supplies to the agent. The Agreement further denoted that such materials would remain the property of State Farm and State Farm would be responsible for providing promotional materials and sharing the cost of the agent's advertisements. The Agreement also required State Farm to supply information and guidance regarding sales promotion, agency procedures, and new products and services. State Farm considered any and all information regarding policyholders to be its property, as specified in the Agreement:

> Information regarding names, addresses, and ages of policyholders of the Companies; the description and location of insured property; and expiration or renewal dates of State Farm policies acquired or coming into your possession during the effective period of this Agreement, or any prior Agreement, except information and records of policyholders insured by the Companies pursuant to any governmental or insurance industry plan or facility, are trade secrets wholly owned by the Companies. All forms and other materials, whether furnished by State Farm or purchased by you, upon which this information is recorded shall be the sole and exclusive property of the Companies.

The Agreement also addressed compensation for agents discontinuing their work with State Farm by providing them with termination payments. Termination payments were payable to those who worked for two or more continuous years and returned all property belonging to State Farm within ten days of termination. The number of policies in force during the last twelve months of the agent's affiliation with the company determined the value of the payments. An agent forfeited his right to termination payments if he solicited policyholders within

one year after terminating the affiliation. The covenant not to compete provided:

> For a period of one year following termination of this Agreement, you will not either personally or through any other person, agency, or organization (1) induce or advise any State Farm policyholder credited to your account at the date of termination to lapse, surrender, or cancel any State Farm insurance coverage or (2) solicit any such policyholder to purchase any insurance coverage competitive with the insurance coverages sold by the Companies.

Baker terminated his relationship with State Farm on February 28, 1997. Baker abided by the terms of the Agreement, returning policy and policyholder descriptions, claim draft books, rate books, agent's service texts, and a computer which contained much of the policy information. Approximately 90% of Baker's 4000 existing policies were assigned to his successor agent. The successor agent, appointed by State Farm, hired the two employees previously employed by Baker and assumed Baker's telephone number. In addition, the successor agent opened an office in the vicinity of Baker's office.

Because Baker had fully complied with the requirements in the Agreement, State Farm made termination payments of $38,622 in 1997. On his 1997 federal income tax return, Baker reported the termination payments as long-term capital gain on Schedule D. He attached a two-page statement to the return which noted that the payments were made pursuant to contracts that "contain specific provisions for the purchase and sale of business intangible assets" and that the money would be paid "in the form of a five year certain annuity designated 'termination payments.'" Baker also specified that the fair market value of the goodwill and going concern was $164,140, but did not assign a value to the covenant not to compete.

In a notice of deficiency, the Commissioner determined that the 1997 termination payments from State Farm were ordinary income and did not qualify for capital gain treatment. Baker filed a petition in the Tax Court contesting the Commissioner's notice of deficiency. The Tax Court ruled in favor of the Commissioner. It found that under the terms of the Agreement, Baker did not own any assets, and thus could not have sold them to State Farm. Accordingly, there was no sale or exchange of a capital asset and the termination payments constituted ordinary income. Baker appeals.

## ANALYSIS

The sole contention on this appeal is whether State Farm's termination payments were consideration for the sale of a capital asset. We review questions of law de novo and factual determinations, along with application of legal principles to those factual determinations, for clear error. *Cline v. Commissioner*, 34 F.3d 480, 484 (7th Cir. 1994).

The Internal Revenue Code defines "capital asset" in the negative: it is property held by the taxpayer that is not covered by an enumerated exception. I.R.C. § 1221(a). The exceptions listed in § 1221 are not pertinent to our analysis.

Long-term capital gain is gain from the sale or exchange of a capital asset held for more than one year. I.R.C. § 1222(3). It is beneficial for a taxpayer to be able to designate a source of income as long-term capital gain because it is taxed at more favorable rates.

Baker has the burden of proving that the Commissioner's deficiency determination was incorrect. *See, e.g.*, *Welch v. Helvering*, 290 U.S. 111, 115 (1933); *Gold Emporium v. Commissioner*, 910 F.2d 1374, 1378 (7th Cir. 1990). Baker must establish that he: (i) owned a capital asset which he held for more than one year; (ii) sold or exchanged this

asset; and (iii) received termination payments in consideration for this sale or exchange.

Fundamentally, in order to have the ability to sell something, one must own it. Because Warren Baker did not own any property related to the policies, he could not sell anything. Section D of the Agreement provides:

> Information regarding names, addresses, and ages of policyholders of the Companies; the description and location of insured property; and expiration or renewal dates of State Farm policies . . . *are trade secrets wholly owned by the Companies*. All forms and other materials, whether furnished by State Farm or purchased by you, upon which this information is recorded *shall be the sole and exclusive property of the Companies*.

(emphasis added). Thus, according to the terms of the Agreement, Warren Baker did not own anything related to the policies.

As the Tax Court noted, Baker returned everything used in the daily course of business to State Farm. He returned the books, records, and customer lists because the Agreement designated them as the "sole and exclusive property" of State Farm.

Baker attempts to sidestep this obstacle by claiming that the payments were in consideration for goodwill. He contends that he developed and maintained goodwill over the course of thirty-four years and that the loyalty of the customer base was to him, not to State Farm.

Goodwill is the expectation of continued patronage. *Newark Morning Ledger Co. v. United States*, 507 U.S. 546, 555 (1993). Goodwill enables a purchaser to step into the shoes of the seller. *Decker v. Commissioner*, 864 F.2d 51, 54 (7th Cir. 1988) (quoting *Winn-Dixie Montgomery, Inc. v. United States*, 444 F.2d 677, 681 (5th Cir. 1971)). Courts

have recognized that the insurance industry treats policy records and policyholder information as goodwill. *Schelble v. Commissioner*, 130 F.3d 1388, 1394 (10th Cir. 1997); *Marsh & McLennan, Inc. v. Commissioner*, 420 F.2d 667, 669-70 (3d Cir. 1969).

As noted above, Baker did not own any assets related to the business. Goodwill cannot be transferred apart from the business with which it is connected. 38 Am. Jur. 2d Goodwill § 10. We find reliance for our position in *Schelble v. Commissioner,* 130 F.3d 1388 (10th Cir. 1997) and *Vaaler v. United States*, 454 F.2d 1120 (8th Cir. 1972). In *Schelble*, the taxpayer argued that "extended earnings" payments made to him after terminating his position as an insurance agent constituted proceeds from the sale of goodwill. The court rejected the taxpayer's argument, finding that no sale of vendible assets occurred. *Schelble*, 130 F.3d at 1394. Citing *Elliott v. United States*, 431 F.2d 1149, 1154 (10th Cir. 1970), the court noted that for tax purposes, a sale of goodwill takes place "only when the business or a part of it, to which the goodwill attaches is sold." *Id.* at 1394. In *Vaaler v. United States*, the Eighth Circuit rejected a similar argument made by the taxpayer. It also cited *Elliott* for the same proposition, adding that as a general agent, the taxpayer built up goodwill for the insurance company, which belonged to the company. *Vaaler*, 454 F.2d at 1123; s*ee also Webster Investors, Inc. v. Commissioner*, 291 F.2d 192, 195 (2d Cir. 1961).

While Baker built the insurance agency; the tools he used were on loan from State Farm. State Farm's termination payments were not for the sale of a business where a buyer was able to step into the seller's shoes. Baker owned nothing. Thus, he could sell no assets, including goodwill. We agree that goodwill was developed during Baker's tenure; however, it was not his to sell.

Since Baker has failed to establish that the payments were consideration for the sale or exchange of a capital

asset, the Commissioner's deficiency determination is upheld. One final point we briefly address: Baker asks if the purpose for the payments are not in consideration for goodwill, what are they? We agree with the Tax Court's conclusion that (a portion of) State Farm's payments were for a covenant not to compete. *See, e.g.*, *Clark v. Commissioner*, 67 T.C.M. 3105 (1994); *Foxe v. Commissioner*, 53 T.C. 21 (1969). The Agreement provides that Baker would not induce any State Farm policyholder to change coverage or solicit coverage through a competitor for one year. The tax consequences of such language are settled: the consideration a buyer pays a seller for a covenant not to compete is taxable as ordinary income. *Patterson v. Commissioner*, 810 F.2d 562, 569 (6th Cir. 1987); *Sonnleitner v. Commissioner*, 598 F.2d 464, 466 (5th Cir. 1979).

Accordingly, the judgment of the Tax Court is AFFIRMED.

A true Copy:

Teste:

_____
*Clerk of the United States Court of Appeals for the Seventh Circuit*