**David E. JONES, Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

No. CIV.A.03–0453–CB–C.

United States District Court, S.D. Alabama, Southern Division.

Dec. 15, 2004.

John J. Crowley, Jr., Coale, Dukes, Kirkpatrick & Crowley, PC, Mobile, AL, for Plaintiff.

Candice M. Turner, U.S. Dept. of Justice Tax Division, Washington, DC, for Defendant.

### ORDER

BUTLER, District Judge.

This matter is before the Court on a motion for summary judgment filed by the defendant, the United States of America. At issue in this case is whether the plaintiff, David E. Jones, is entitled to a refund for overpayment of taxes. Plaintiff, a former State Farm Insurance agent, contends that payments made to him by State Farm during the three-year period following his retirement should have been treated as part of a long-term capital gain, rather than ordinary income, and taxed at a lower

rate. On the other hand, the United States seeks summary judgment, asserting that there are no facts from which a jury could reasonably conclude that the payments were for the purchase and sale of a capital asset. For reasons discussed below, the Court finds that the payments are not entitled to capital gains treatment; therefore, the United States is entitled to summary judgment.

**Findings of Fact**

Plaintiff David E. Jones worked for State Farm Insurance from 1959 until his retirement in 1996. Jones worked in corporate positions for State Farm until 1974, when he decided to become an agent. Jones made this decision based, in part, upon enhanced financial prospects that an agency would bring and also, in part, upon his knowledge that State Farm represented to prospective agents that they would become business owners and that their agencies would be purchased if they decided to terminate their relationship with State Farm. Jones became an agent trainee in 1974 and a full agent in 1977, at which time he entered a State Farm Agent's Agreement (hereinafter "Agent's Agreement" or "Agreement"). Jones leased an office, hired employees, purchased office equipment and furniture, and began advertising and selling insurance. Jones developed 4,600 auto insurance policies and 3,800 fire insurance policies during his tenure as a State Farm agent.

Jones' relationship with State Farm was governed by the Agent's Agreement. Jones was not able to negotiate or change the terms of the Agreement, which required him to sell insurance exclusively for State Farm. Pursuant to the Agreement, Jones operated as an independent contractor, with full control over his daily activities and full responsibility for his office expenses and staffing. His duties included soliciting applications for insurance, collecting payments and assisting State Farm policyholders. As compensation, Jones received commissions on new policies and on renewals of existing policies.

The Agreement also allowed State Farm to assign existing policies to Jones, in exchange for which Jones received a smaller commission than he received on policies he personally produced. Assignments could be made under four circumstances: (I) when policyholders moved to the geographic location covered by his agency, (ii) when other State Farm agents' agreements were terminated, (iii) when, due to illness or other such circumstances, State Farm agents had to reduce the number of policies they serviced and (iv) when State Farm acquired new business as a result of merger, purchase, governmental action or insurance industry agreement. In addition, Jones' policies could be reassigned to other agents when policyholders moved out of Jones' geographic area.

By its terms, the Agreement would terminate upon Jones' death or upon written notice by either party. Jones was entitled to termination payments if the following conditions were met: (1) the Agreement was terminated two or more years after its effective date and (2) within ten days after the termination of the Agreement, all property belonging to State Farm was returned or made available for return to State Farm. Those terminations payments were subject to forfeiture, however, if Jones personally or through any other person, agency or organization, induced or advised any State Farm policyholder credited to his account to lapse, surrender or cancel any State Farm insurance coverage or solicited any such policyholder to purchase any competing insurance coverage. Termination payments were subject to reduction if the policies plaintiff had produced did not remain in force subsequent to his termination. The amount of termination payments differed for each compa-

ny comprising State Farm (*e.g.,* automobile, fire, etc.) but, in general, were based on a percentage of Jones' compensation for the 12 months prior to termination. Prior to his retirement, Jones received a 15% commission on fire policies and a 10% commission on automobile policies.

Jones retired and terminated the Agreement with State Farm effective December 31, 1996. All of Jones' policies were assigned to a successor agent, William Murphy. Murphy purchased the office building and personal property formerly owned by Jones. Murphy also hired the employees who had been employed by Jones. The purchase agreement entered into between Jones and Murphy covered only the building and its furnishings and made no mention of goodwill or the purchase of Jones' insurance business. When Jones became a State Farm agent, he was required to release his telephone number to State Farm, and after Jones' retirement Murphy assumed the telephone number previously used by Jones. Pursuant to the Agreement, within ten days after termination, Jones returned all property to State Farm, including policies and policyholder descriptions, claim draft books, rate books, agent's service texts and a computer on which most of the policyholder information was stored.

Jones received termination payments from State Farm of $98,868, $89,921 and $90,440 for the years 1997, 1998 and 1999, respectively. The amount of the termination payments was determined by applying a percentage to policies produced by Jones prior to his retirement. Before Jones' retirement, he received a commission of $15 for every $100 of fire insurance premiums received by State Farm and $10 for every $100 of automobile premiums received by State Farm. After his retirement, Jones commissions were reduced to $9.00 and $7.00, respectively. Murphy was compensated for policies produced by

Jones and subsequently assigned to Murphy according to a schedule of payments contained in State Farm's AA97 Agent's Agreement. For Jones' former policies assigned to him Murphy received commissions of $3.00 per $100 of fire premiums and $2.00 per $100 of automobile premiums.

On his federal income tax returns for the years 1997, 1998 and 1999, Jones reported the termination payments as ordinary income. He later amended his returns to characterize the payments as long-term capital gains and attached a statement to his return stating that the payments were for intangible assets and that State Farm purchased a covenant not to compete. The Commissioner disallowed Jones' claim for refund and concluded that the termination payments from State Farm must be reported as ordinary income rather than capital gain.

## Conclusions of Law

The issue presented in this case is rather straightforward. Jones contends that the termination payments he received from State Farm were actually payments for the sale of intangible assets-goodwill and going concern value-which are capital assets entitled to capital gains treatment. The United States, on the other hand, argues that Jones did not own the intangible assets allegedly conveyed; therefore, no capital gain was realized. Case law and common sense support the United States' argument.

In addressing the summary judgment motion, the Court keeps in mind that summary judgment should be granted only if "there is no issue as to any material fact and the moving party is entitled to a judgment as a matter of law." Fed.R.Civ.P. 56(c). The party seeking summary judgment bears "the initial burden to show the district court, by reference to materials on file, that there are no genuine issues of

material fact that should be decided at trial." *Clark v. Coats & Clark, Inc.*, 929 F.2d 604, 608 (11th Cir.1991). Once the moving party has satisfied his responsibility, the burden shifts to the nonmoving party to show the existence of a genuine issue of material fact. *Id.* "If the nonmoving party fails to make 'a sufficient showing on an essential element of [his] case with respect to which she has the burden of proof,' the moving party is entitled to summary judgment." *United States v. Four Parcels of Real Property*, 941 F.2d 1428, 1437 (11th Cir.1991) (quoting *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986)) (footnote omitted). "In reviewing whether the nonmoving party has met its burden, the court must stop short of weighing the evidence and making credibility determinations of the truth of the matter. Instead, the evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tipton v. Bergrohr GMBH–Siegen*, 965 F.2d 994, 999 (11th Cir.1992) (internal citations and quotations omitted). Few, if any, of the facts are disputed in this instance; rather, plaintiff's case hinges on the inferences to be drawn from those facts.

To prevail in his suit for refund, Jones must prove that the terminations payments were actually a long-term capital gain, which is taxed a lower rate than ordinary income. *See* I. .R.C. § 1 (setting forth tax rates on various types of income, including long-term capital gains and ordinary income). The Internal Revenue Code defines long-term capital gain as "gain from the sale or exchange of a capital asset held for more than one year." I.R.C. § 1222(3). A capital asset is defined simply as "property held by the taxpayer." I.R.C. § 1221(a).[1] Despite the statute's

apparently broad definition, the term "is to be construed narrowly in accordance with the purpose of Congress to afford capital gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." *Commissioner v. Gillette Motor Transport, Inc.*, 364 U.S. 130, 133, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960).

According to Jones, the termination payments were a long-term capital gain because they represented payment for the sale of intangible assets related to his insurance agency-good will and going concern value. Although the payments themselves came from State Farm, Jones argues that State Farm was merely the conduit for payments from Murphy, who actually purchased these intangible assets. Jones' theory fails for two reasons. First, there is no evidence to support his theory that the termination payments were consideration from Murphy. Second, Jones did not own the intangible assets he purports to have sold.

Jones asserts that State Farm served as a broker for the sale and purchase of Jones' agency, including its tangible and intangible assets, and as a conduit for a portion of the payment. While Murphy purchased the tangible assets by providing consideration to Jones directly, Jones contends that the termination payments are, in reality, consideration paid by Murphy to Jones indirectly via State Farm. Jones can point to no written or oral agreement to support his theory, and there is no evidence that Murphy or State Farm intended the type of transaction Jones describes. Nevertheless, Jones asserts that Murphy, in effect, "paid" him for the intangible

---

1. More specifically, the term "capital asset" is defined by what it is not. Section 1221(a) lists numerous types of property excluded from the definition, but none of those are applicable here.

assets of the business by accepting reduced commissions on policies developed by Jones and that these reductions were paid to Jones via State Farm in the form of termination payments. Jones' theory fails for the simple reason that there is no evidence that Murphy accepted a "reduced" commission.[2]

Murphy could not have purchased the business's intangible assets, in any event, because Jones did not own them. To understand Jones' argument in this regard, it is necessary to understand the case law he must distinguish in order to succeed on his claim. *Baker v. Commissioner*, 338 F.3d 789 (7th Cir.2003) involved a nearly identical fact situation. The plaintiff, Baker, was a State Farm agent who operated under an agent agreement similar to the one in this case. Baker started the agency from scratch and worked as a State Farm agent for 34 years. When he terminated his agreement, Baker fully complied with the terms of the termination provision. State Farm appointed a successor agent who hired Baker's employees and assumed Baker's telephone. The successor agent did not take over Baker's office location but opened an office in the vicinity. Baker reported the termination payment he received in 1997 as a long-term capital gain for the purchase and sale of intangible assets. A deficiency was assessed against him by the Commissioner, the assessment was upheld by the Tax Court and Baker appealed.

Baker argued that the intangible asset he sold to State Farm was the "goodwill" he had developed over the course of his years as an agent, but the Seventh Circuit disagreed. The appellate court noted that the goodwill of an insurance business is its "policy records and policyholder information." Since Baker's agent agreement pro-

vided that State Farm owned the policy records and policyholder information, the court concluded that "[w]hile Baker built the insurance agency; the tools he used were on loan from State Farm. Baker owned nothing. Thus, he could sell no assets, including goodwill[,] [and although] ... goodwill was developed during Baker's tenure[,][ ] it was not his to sell." *Id.* at 794. Since Jones' Agent Agreement, like Baker's, provides that State Farm owns all policy records and policy information, the *Baker* decision would seem to foreclose the capital gains treatment Jones seeks.

In contrast to Baker, however, Jones asserts that he sold his business to Murphy and that intangible assets, *i.e.*, goodwill and going concern value, were included in that sale. Jones argues that the sale of the building and personal property to Murphy, the successor agent, distinguishes this case from *Baker*, in which no real or personal property changed hands. The fallacy in Jones' argument is that he equates the sale of his office building and personal property to the sale of the insurance business. Goodwill "cannot be transferred a part [sic] from the business with which it is connected." *Id.* at 793. The business with which goodwill was connected was the insurance business, and the goodwill of that business-insurance policies and policyholder information-were owned by State Farm, not by Jones.

Jones argues that going concern value was his to sell, even if goodwill was not, and that Murphy purchased it when he purchased tangible assets and became the successor agent to Jones. Going concern value is defined as

the additional value that attaches to property by reason of its existence as an integral part of an ongoing business ac-

---

**2.** Put another way, there is no evidence that Murphy would have been entitled to a greater commission had the policies been assigned to him if he had not purchased Jones' real and personal property.

tivity. Going concern value includes the value attributable to the ability of a trade or business (or a part of a trade or business) to continue functioning or generating income without interruption notwithstanding a change in ownership.

26 C.F.R. § 1.197–2(b)(2). As with goodwill, the ongoing business to which going concern value attached was the insurance business. That business was comprised of insurance policy records and policyholder information which belonged to State Farm and was not Jones' to sell. Since Jones did not sell the business to Murphy, the Court rejects his claim that the termination payments from State Farm were actually consideration from Murphy for going concern value of the business.

Jones alternatively argues that he did, in fact, own an intangible asset, notwithstanding State Farm's ownership of policyholder information. Jones' support for this argument is a hodgepodge of dicta. For example, petitioner cites *Cordova v. State Farm Insurance*, 124 F.3d 1145, 1147 n. 1 (9th Cir.1997), in support of his argument that he owned intangible "vendible assets." That case, however, is a Title VII case, and the footnote merely describes a State Farm agents as "self-employed independent contractors who own, and develop equity, in their business." Jones also cites several tax court cases for the proposition that "the relationship between an individual and his customers is an asset personal to the individual" and does not belong to the corporation. (Pl.'s Brf. p. 16.) None of these cases address whether an individual can assign that intangible asset to another by agreement, nor do they address the specific effect of an agent agreement vesting ownership of

policyholder information in the insurance company.[3]

## Conclusion

In sum, the Seventh Circuit's opinion in *Baker* is persuasive, and the distinctions between those facts and the facts of the instant case are of no import. Plaintiff did not sell any intangible assets because those assets (and the tangible assets to which they attached) were owned by State Farm. Consequently, the Commissioner was correct in concluding that the payments received from State Farm were not entitled capital gains treatment. It is, therefore, **ORDERED** that the defendant's motion for summary judgment is be and hereby is **GRANTED**.

### *FINAL JUDGMENT*

Pursuant to separate order entered this date granting the motion for summary judgment filed by the defendant, it is hereby **ORDERED, ADJUDGED and DECREED** that the claims of the plaintiff, David E. Jones, against the defendant, the United States of America, be and hereby are **DISMISSED** with prejudice.

---

3. One of the cases, *MacDonald v. Commissioner,* 3 T.C. 720, 1944 WL 121 (1944), involved the conveyance of an insurance brokerage firm from a corporation owned as marital property to the husband/agent as sole owner. The court found that goodwill was personal to the husband and was not owned or transferred by the corporation in the conveyance. The case did not address the existence of goodwill or intangible assets in light of an agent's agreement similar to the one in this case.