T.C. Summary Opinion 2009-165

UNITED STATES TAX COURT

STEVEN LENARD AND JAMIE TEAGUE-LENARD, Petitioners v.
COMMISSIONER OF INTERNAL REVENUE, Respondent

Docket No. 27826-07S.          Filed November 9, 2009.

Steven Lenard and Jamie Teague-Lenard, pro sese.

Thomas L. Fenner, for respondent.

DEAN, Special Trial Judge: This case was heard pursuant to the provisions of section 7463 of the Internal Revenue Code in effect when the petition was filed. Pursuant to section 7463(b), the decision to be entered is not reviewable by any other court, and this opinion shall not be treated as precedent for any other case. Unless otherwise indicated, subsequent section references are to the Internal Revenue Code in effect for the year in issue,

and all Rule references are to the Tax Court Rules of Practice and Procedure.

Respondent determined a deficiency in petitioners' 2005 Federal income tax of $14,129, an addition to tax for failure to file timely under section 6651(a)(1) of $707, and an accuracy-related penalty under section 6662(a) of $2,826.

The parties agree that petitioners are entitled to deduct expenses for the insurance agency business of Steven Lenard (petitioner) of $78,952 for 2005. The parties also agree that, without taking into consideration certain contested payments by Farmers Insurance Group of Companies (Farmers), petitioner's insurance agency business generated gross receipts of $111,632 in 2005. The parties further agree that petitioners are not liable for the addition to tax under section 6651(a)(1).[1] The issues for decision[2] are whether: (1) Unreported "Contract Value" payments by Farmers to petitioners in 2005 are ordinary income; (2) the contract value payments by Farmers to petitioners are subject to self-employment tax; and (3) petitioners are liable for the accuracy-related penalty under section 6662(a).

---

[1]The stipulation of settled issues states the parties' agreement that petitioners are not liable for the addition to tax under sec. 6651(a)(2), but the notice of deficiency does not determine that addition to tax.

[2]Adjustments to petitioners' child tax credit, earned income credit, itemized deductions, and self-employment tax deduction are computational and will be resolved consistent with the Court's decision. See secs. 24(b), 32, 67(a), 164(f), 1401.

## Background

Some of the issues and facts have been stipulated and are so found. The stipulation of facts and the exhibits received in evidence are incorporated herein by reference. Petitioners resided in Texas when their petition was filed.

## History of the Insurance Agency

During the year at issue petitioner was a property and casualty insurance agent for Farmers conducting his business as Steve Lenard Agency (the agency). He was introduced to the insurance business by his father, who started doing business with Farmers in 1956. Petitioner began working with his father in 1982, and in 1983 he signed an agency agreement with Farmers known as the 32-0389 contract (old contract). In 1987 petitioner signed a revised agreement known as the 32-1106 contract that is the subject of this litigation.

## The 1987 Agreement

Under the 32-1106 contract, the "Agent's Appointment Agreement" (AAA), petitioner accepted an appointment as "agent" for Farmers. Among other items under the agreement, Farmers agreed to: (1) Pay petitioner as an agent "new business and service commissions or any other commission" according to established schedules; and (2) provide approved manuals, forms, and policyholder records necessary to carry out the provisions of the agreement.

The AAA provided that petitioner agreed to several items, including: (1) To sell insurance for Farmers in accordance with their rules and manuals; (2) to provide facilities necessary to furnish insurance services, including collecting and remitting money, receiving and adjusting claims, notifying the company of claims, and servicing all policyholders of Farmers; and (3) to permit the authorized representatives of Farmers to review and examine agency records. There was a series of other pertinent provisions in the AAA.

Provision F

Provision F of the AAA allowed for the agent or the agent's heirs to "sell all or any part of this Agency" to a member of the agent's immediate family if acceptable to Farmers, provided the "sale price does not exceed the proportionate share of the 'Contract Value'" of the agency.

Provision G

If the agency is terminated other than by a "sale" under provision F, provision G stated that Farmers agreed to pay the "Contract Value" to the agent or heirs. The contract value is an amount based on: (1) The amount of service commissions paid to the agent on active policies during either the "six month or twelve month period immediately preceding termination"; (2) "the number of policies in the agent's active code number"; and (3) "the number of years of continuous service as an Agent" for

Farmers immediately before termination.[3]  Provision G stated that if an agent had fewer than 50 policies in an active code number, "there is no Contract Value".

Provision G also provided for an "Underwriting Contract Value Bonus" (bonus).  The bonus was to be a percentage based on the contract value at the time of termination, in accordance with the bonus program as modified by Farmers from time to time.

### Provision H

Provision H provided that the agent, upon tender of the payment described in provision G, agreed to assign all of his "interest under this Agreement and Agency" including any interest in the telephone numbers and leased or rented office space to Farmers, at their request.  The agent also <u>agreed to accept tender of contract value</u> and for 1 year to not "directly or indirectly solicit, accept, or service the insurance business" of a policyholder of record as of the date of payment.

### Provision I

Provision I stated that the agent acknowledges that all manuals, lists, and records of any kind (including policyholder and expiration information) are the confidential <u>property of Farmers</u>.  This provision of the AAA further states that the

---

[3]Percentage increases were activated at the fifth, tenth, and fifteenth year of service.

manuals, lists, and records "shall be returned" to Farmers upon termination of the agency.

Termination of the Agency by Petitioner

In May 2005 petitioner faxed a letter to the Texas State executive of Farmers in which he offered his official resignation as an agent. By the end of June 2005 petitioner had returned to Farmers all manuals, lists, and records as required by his contract, including information pertaining to policyholders and all other property of Farmers. Farmers did not request or receive petitioner's business phone number or leasehold. On June 30, 2005, petitioner and Farmers terminated the AAA. The contract value of the AAA was $60,596 as of the termination date. The contract value calculation for petitioner included the three required items of provision G.

Petitioner's AAA contract value of $60,596 included a bonus of $3,430. Of the $60,596 due to petitioner, he received $51,009.56 in 2005.

Petitioners' Tax Return for 2005

Petitioners, pursuant to an extension of time to file, timely mailed their Federal income tax return for 2005 on October 16, 2006. Included with the return was a Schedule C, Profit or Loss From Business, for the agency, reporting gross receipts of $98,848. The contract value payments petitioners received in 2005 were not reported on the return.

## Discussion

Generally, the Commissioner's determinations in a notice of deficiency are presumed correct, and the taxpayer has the burden of proving that those determinations are erroneous. See Rule 142(a); Welch v. Helvering, 290 U.S. 111, 115 (1933). In some cases the burden of proof with respect to relevant factual issues may shift to the Commissioner under section 7491(a). As there is no dispute as to a factual issue, section 7491(a) is inapplicable to this case.

## Capital Gain or Ordinary Income

Petitioners do not dispute that the termination payments constitute gross income. Petitioners, however, believe that they "sold" the agency, including goodwill of the business, to Farmers. According to petitioners, Farmers' payment of the contract value was in exchange for the agency, "including the files, data, phone lines, etc" and the "contractual non-compete clause." Their belief is based in part on provision F of the AAA that allows for the agent or the agent's heirs to "sell all or any part of this Agency" to a member of the agent's immediate family for a price not in excess of the contract value of the agency. Because of their belief that the agency was sold to Farmers, petitioners assert that the proceeds qualify for capital gain treatment.

Respondent takes a different view. Respondent argues that petitioners did not sell any property to Farmers; there was no transfer of title, so there could be no sale of a capital asset. Because petitioners sold no assets to Farmers, they could not have sold Farmers any goodwill.

Respondent cites as support for his position the Court's Opinion in Baker v. Commissioner, 118 T.C. 452 (2002), affd. 338 F.3d 789 (7th Cir. 2003). The facts of that case are surprisingly similar to those of the case at hand. The taxpayer was an insurance agent for State Farm Insurance Co. (State Farm) whose compensation consisted of commissions on new policies and renewals of existing policies. The taxpayer was an independent contractor who was responsible for his own office expenses and hiring and paying his own employees. His relationship with State Farm was governed by an agent's agreement that could not be sold, assigned, or pledged without the consent of State Farm. State Farm supplied the taxpayer with manuals, records, forms, and supplies, but the agreement provided that those items as well as information regarding policyholders constituted the "sole and exclusive property" of State Farm.

The agent agreement in Baker also provided for termination payments to agents who had: (1) Worked for 2 or more continuous years, (2) returned all property belonging to State Farm upon termination, and (3) agreed not to compete for business from

State Farm policyholders for a year following termination.  The issue for decision in <u>Baker</u> was whether the termination payments were for the sale of a capital asset, the same issue being contested here.

The Court held in <u>Baker</u> that the taxpayer's State Farm insurance agency was not a capital asset.  Since he did not own a capital asset that he could sell, the termination payment could not represent gain from the sale of a capital asset.  And because he did not own and sell his agency as a capital asset, he did not sell any "goodwill" to the insurance company he represented.  Having determined that the termination payment was not gain from the sale of a capital asset, the Court found that it was taxable as ordinary income.

Petitioners admit that they have searched for a tax case with an opinion contrary to that of <u>Baker</u> but "we could find none."  Petitioners have attempted to distinguish their case from <u>Baker</u>, relying on the wording of provision F of the AAA.  That provision provides that the agent may "sell" the agency to a member of the agent's immediate family "if acceptable to Farmers", provided the price does not exceed the contract value of the agency.  Despite petitioners' argument, it is not apparent to the Court how the language of provision F allowing a sale to a family member if acceptable to Farmers is different in substance from the provision in the agreement in <u>Baker</u> allowing a sale,

assignment, or pledge of the agency (apparently to anyone) only with the consent of State Farm.  In fact, it appears that the AAA's provision on "sale" was more restrictive than was the taxpayer's agreement in Baker.

Petitioners' pretrial memorandum referenced the case of Heston v. Farmers Ins. Group, 206 Cal. Rptr. 585 (Ct. App. 1984). In Heston, an insurance agent sought declaratory and injunctive relief to prevent Farmers from removing policyholder files and information from his agency.  That court held that the agent involved could terminate the agency, refuse to accept contract value, retain possession of policyholder files and records, and compete against Farmers for policyholder business.  The court's holding resulted from its interpretation of Farmers' old contract using, in part, parol evidence.

Petitioner, however, admits in his pretrial memorandum that on account of the decision in Heston, Farmers began exerting "tremendous pressure" and threatened termination of petitioner's agency.  As a result petitioner "relented and signed the new, 32-1106 AAA."  The new AAA, among other items, revised provision H in part by adding language that says:  "The Agent agrees to accept tender of Contract Value".  Because of the new contract provision in the AAA, an agent could not refuse to accept contract value, as the agent did in Heston, without breaching the agreement.

The Court finds that the case of Heston v. Farmers Ins. Group, supra, does not affect the application of the reasoning and the holding of the Court's Opinion in Baker v. Commissioner, supra.  See also Trantina v. United States, 512 F.3d 567, 572 (2008) (payment to terminate service contract is not capital gain unless contract is for more than right to perform service or receive payment for services).  Petitioners' termination payment received in 2005 constitutes ordinary income, not capital gain.

Self-Employment Tax

Generally, the tax on self-employment income applies to the "net earnings from self-employment" of an individual.  Secs. 1401, 1402(b).  In simplified terms, net earnings from self-employment means the "gross income derived by an individual from any trade or business carried on by such individual," less the deductions attributable to the trade or business.  Sec. 1402(a). In order for income to be taxable as self-employment income, "there must be a nexus between the income received and a trade or business that is, or was, actually carried on."  Newberry v. Commissioner, 76 T.C. 441, 444 (1981).  The Court's interpretation of the "nexus" standard requires that "any income must arise from some actual (whether present, past, or future) income-producing activity of the taxpayer before such income becomes subject to" self-employment tax.  Id. at 446.  Gross income derived from an individual's trade or business may be

subject to self-employment tax even when it is attributable in whole or in part to services rendered in a prior taxable year. Sec. 1.1402(a)-1(c), Income Tax Regs.

In applying the definition of self-employment income, the Court must decide whether the termination payments were: (1) Derived (2) from a trade or business (3) carried on by petitioner. See sec. 1402(a).

Petitioners rely primarily on Milligan v. Commissioner, 38 F.3d 1094 (9th Cir. 1994), revg. T.C. Memo. 1992-655, to support their position that the termination payments are not self-employment income. The agent's agreement in Milligan conditioned termination payments to the agent upon terminating the agreement no sooner than 2 years after its effective date, returning State Farms' property, and refraining from competition with State Farm for 1 year. The agent's agreement also conditioned the termination payments upon adjustments to reflect the amount of income received by State Farm on the taxpayer's "book of business" during the first year after termination and the number of the policies produced by the taxpayer that were canceled during the first year after termination.

The court found that to be "derived" from a taxpayer's trade or business, income must arise from some actual income-producing activity, past or present, of the taxpayer. Id. at 1098. "To be taxable as self-employment income, earnings must be tied to the

quantity or quality of the taxpayer's prior labor". <u>Id.</u> The court found that the payments were subject to adjustments related not to the taxpayer's business activity but to that of his successor.

Congress has codified the standard established in <u>Milligan</u> for termination payments made to an insurance salesman after December 31, 1997, in section 1402(k). Taxpayer Relief Act of 1997, Pub. L. 105-34, sec. 922(a), (c), 111 Stat. 879, 880. Section 1402(k) exempts the termination payments of insurance salesmen from self-employment tax as long as the payments do not depend "to any extent" on length of service (except for a length of service requirement for eligibility) or overall earnings from service.

Petitioner's termination payments fall outside the protection of section 1402(k) and the court's holding in <u>Milligan</u>.

Provision G of petitioner's contract specifically provides that his termination payments are determined by three items: (1) The amount of service commissions paid to him on active policies during either the "six or twelve month period immediately preceding termination"; (2) "the number of policies in the agent's active code number"; and (3) "the number of years of continuous service as an Agent" for Farmers immediately before termination. The termination payments depended on petitioner's

length of service and his overall earnings from service and therefore fall outside the protection of section 1402(k).

Petitioners' case is analogous to that of the taxpayer in Schelble v. Commissioner, T.C. Memo. 1996-269, affd. 130 F.3d 1388 (10th Cir. 1997). The taxpayer's payments in that case depended in part on how long he had been an agent for the insurance company. Like petitioner, to qualify for the lowest level of payments the taxpayer had to have represented the company for at least 5 years. The taxpayer, like petitioner, earned a higher payment than if he had been an agent for only 5 or 10 years. The taxpayer had to have 400 or more policies in force at the time his agency was terminated while petitioner was required to have 50. And like petitioner's, the taxpayer's termination payments were based on the commissions received during the last 6 or 12 months preceding the termination of the agreement.[4]

The Court found in Schelble that the payments received by the taxpayer were tied to the quantity and quality of his prior services and were subject to self-employment tax. The Court finds that petitioner's termination payments were tied to the quantity and quality of his prior service and are subject to

---

[4]Respondent points out that while provision E of the AAA subjects petitioner's right to receive commissions payable in the year after termination to a "chargeback", it would not affect contract value and would not reduce petitioner's termination payments.

self-employment tax.  See also Parker v. Commissioner, T.C. Memo. 2002-305; Farnsworth v. Commissioner, T.C. Memo. 2002-29.

The Accuracy-Related Penalty

Section 7491(c) imposes on the Commissioner the burden of production in any court proceeding with respect to the liability of any individual for penalties and additions to tax.  Higbee v. Commissioner, 116 T.C. 438, 446 (2001); Trowbridge v. Commissioner, T.C. Memo. 2003-164, affd. 378 F.3d 432 (5th Cir. 2004).  In order to meet the burden of production under section 7491(c), the Commissioner need only make a prima facie case that imposition of the penalty or addition to tax is appropriate. Higbee v. Commissioner, supra.

Respondent determined that petitioners are liable for an accuracy-related penalty under section 6662(a).  Section 6662(a) imposes a 20-percent penalty on the portion of an underpayment attributable to any one of various factors, including a substantial understatement of income tax.  See sec. 6662(b)(2). A "substantial understatement" includes an understatement of tax that exceeds the greater of 10 percent of the tax required to be shown on the return or $5,000.  See sec. 6662(d); sec. 1.6662-4(b), Income Tax Regs.

Section 6664(c)(1) provides that the penalty under section 6662(a) shall not apply to any portion of an underpayment if it is shown that there was reasonable cause for the taxpayer's

position and that the taxpayer acted in good faith with respect to that portion.  The determination of whether a taxpayer acted with reasonable cause and in good faith is made on a case-by-case basis, taking into account all the pertinent facts and circumstances.  Sec. 1.6664-4(b)(1), Income Tax Regs.  The most important factor is the extent of the taxpayer's effort to assess his proper tax liability for the year.  Id.

Petitioners had a substantial understatement of income tax for 2005 since the understatement amount exceeded the greater of 10 percent of the tax required to be shown on the return or $5,000.  Petitioners also failed to report $51,009.56 of income. The Court concludes that respondent has produced sufficient evidence to show that the accuracy-related penalty under section 6662 is appropriate.

Petitioners have not shown that their failure to report such a large amount of income was an action taken with reasonable cause and in good faith.  Respondent's determination of the accuracy-related penalty under section 6662(a) for 2005 is sustained.

To reflect the foregoing,

Decision will be entered

under Rule 155.