**FOR PUBLICATION**

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

CHARLES E. TRANTINA; LINDA M.
TRANTINA,
     *Plaintiffs-Appellants,*

     v.

UNITED STATES OF AMERICA,
     *Defendant-Appellee.*

No. 05-16102

D.C. No.
CV-03-02579-SRB

OPINION

Appeal from the United States District Court
for the District of Arizona
Susan R. Bolton, District Judge, Presiding

Argued and Submitted
April 19, 2007—San Francisco, California

Filed January 9, 2008

Before: Stephen Reinhardt, Jay S. Bybee, and
Milan D. Smith, Jr., Circuit Judges.

Opinion by Judge Bybee

**COUNSEL**

Robert P. Solliday, Thomas M. Quigley, Christopher L. Raddatz, David M. Kozak, Mohr Hackett Pederson Blakely & Randolph, P.C., Phoenix, Arizona, for the appellants.

Eileen J. O'Connor, Kenneth L. Greene, Francesca U. Tamami, Bridget M. Rowan, Tax Division, Department of Justice, Washington, D.C., for the appellee.

---

**OPINION**

BYBEE, Circuit Judge:

This case requires us to determine whether a contract to provide insurance services can be treated as a capital asset under 26 U.S.C. § 1221(a). If the contract is a capital asset, then payments under the contract may be taxed as capital gains, which are taxed at a lower rate than ordinary income. We join the Seventh Circuit and conclude that the district court correctly found that these payments under the contract were ordinary income. *Baker v. Comm'r*, 338 F.3d 789, 793 (7th Cir. 2003).

## I.   FACTS AND PROCEDURAL HISTORY

Charles E. Trantina served as an insurance agent for State Farm Insurance Companies ("State Farm") in the Phoenix area from 1958 until his retirement in 1996. He operated his insurance agency as a sole proprietorship until 1978. In 1978, he incorporated the agency as Trantina Insurance Agency, Inc. ("the Corporation"), an Arizona corporation of which he was the sole shareholder. Upon incorporation in 1978, State Farm and the Corporation executed a Corporation Agent Agreement ("Corporate Agreement"), which lies at the center of the current dispute.

The Corporate Agreement governed all aspects of the Corporation's relationship with State Farm. The Corporate Agreement imposed on the Corporation, among other duties, the obligation to solicit insurance applications, collect premiums and other charges, service insurance policies, help with insurance claim processing, and deposit monies collected on behalf of State Farm into a trust account. The Corporate Agreement required that the Corporation's principal business be the fulfillment of the agreement and that the Corporation and its sales representatives sell insurance exclusively for State Farm. State Farm, in turn, took upon itself the obligation to assist the Corporation with a portion of advertising costs as well as to provide the Corporation with insurance manuals, forms, and records.

Under the agreement, all of the manuals, forms, and records provided to the Corporation by State Farm remained the property of State Farm. The Corporate Agreement also provided that all information relating to policyholder names, addresses, and ages, as well as information about policy details, such as expiration or renewal dates and the location of insured property, were trade secrets of State Farm. The Corporate Agreement provided that all forms or other materials on which such information was recorded were the sole property of State Farm.

State Farm compensated the Corporation for its services by paying commissions for generating or servicing policies, providing higher commissions for servicing policies that the Corporation had generated. When Trantina began his career as a State Farm insurance agent in 1958, he was assigned 20 policies to service. When he retired and liquidated the Corporation in 1996, the Corporation was servicing over 17,000 policies, a large portion of which Trantina himself had generated.

In addition to the regular commission payments, the Corporate Agreement required State Farm to pay the Corporation

termination payments when the agreement terminated, payable monthly for five years. These payments were contingent upon the satisfaction of two conditions. First, the Corporation was required to return to State Farm, within ten days of the termination, all of State Farm's property, such as the forms, manuals, and other documents containing information concerning insurance policies and policyholders. Satisfaction of this condition entitled the Corporation to the first two monthly termination payments.

The remaining monthly termination payments required satisfaction of an additional condition: The Corporation, its president, and its licensed sales representative—three positions all held by Trantina—were required to comply with a non-compete agreement that prevented Trantina, for a period of twelve months, from selling insurance competitive with State Farm's products to any of the customers whose policies he had serviced. Compliance with both the first and second conditions entitled the Corporation to receive the remainder of the monthly termination payments.

In 1996, after serving as State Farm's insurance agent for thirty-eight years, Trantina retired. He accordingly notified State Farm that the Corporate Agreement would terminate on June 30, 1996. Following termination of the agreement, the Corporation returned all of State Farm's property within ten days as required by the agreement, and Trantina complied with the non-compete provision, thus entitling the Corporation to the termination payments. The Corporation received the termination payments until its dissolution in March 1997; Trantina, as the Corporation's sole shareholder, received the payments following dissolution.

In 1999, Trantina and his wife, Linda Trantina,[1] filed a joint

---

[1]Linda Trantina is a party to this litigation because the tax return in question is a joint tax return. References to "Trantina" in the text, however, refer solely to Charles Trantina.

tax return classifying the termination payments that Trantina received from State Farm as ordinary income. On April 10, 2003, they timely filed an amendment to their 1999 income tax return, seeking to reclassify the termination payments as a long term capital gain and thereby reduce their tax liability for 1999. The Trantinas accordingly claimed a refund for the 1999 tax year in the amount of $15,982 plus interest. The IRS denied their claim for a refund on June 30, 2003, and the Trantinas timely filed suit for a refund in the federal district court for the District of Arizona on December 24, 2003. Both parties moved for summary judgment, and the district court granted summary judgment for the United States on May 17, 2005.

The Trantinas advanced two claims for the refund in the district court. First, they claimed that the termination payments were long term capital gain because the payments, originally an asset of the Corporation, were made to Trantina after he exchanged his shares in the Corporation for the assets of the Corporation during the liquidation. Second, the Trantinas claimed that the payments are long term capital gains resulting from the sale or exchange of a capital asset—the Corporate Agreement itself—held longer than one year. *See Trantina v. United States*, 381 F. Supp. 2d 1100, 1103 (D. Ariz. 2005).

The district court found that because the Trantinas failed to present their first claim to the I.R.S., the court was without jurisdiction to hear that claim. *See id.* at 1103-05. The district court also granted summary judgment for the United States on the Trantinas' second claim, reasoning that the Corporate Agreement was not a capital asset and that, even if it was, no exchange or sale of the Corporate Agreement had occurred. *See id.* at 1105-06. On appeal, the Trantinas only challenge this second issue.[2]

---

[2]We review the district court's grant of summary judgment *de novo*. *Laws v. Sony Music Entm't*, 448 F.3d 1134, 1137 (9th Cir. 2006). This

## II.   CLASSIFICATION OF THE TERMINATION PAYMENTS

No one disputes that the termination payments made to Trantina constitute gross income to the Trantinas and are, therefore, taxable. *See* 26 U.S.C. § 61(a) ("Except as otherwise provided in this subtitle, gross income means all income from whatever source derived . . . ." ). However, as everyone who has attempted to navigate the labyrinth of the federal tax code knows, not all gross income is taxed at the same rate. The Trantinas argue that the termination payments qualify as long term capital gains, which are taxed at a lower rate than ordinary income. *See id.* § 1(h). The United States asserts that the termination payments are ordinary income.

**[1]** A long term capital gain is defined as a "gain from the sale or exchange of a capital asset held for more than 1 year, if and to the extent such gain is taken into account in computing gross income." 26 U.S.C. § 1222(3). The statute establishes three requirements that must be met to classify income as a long term capital gain: The payments (1) must arise from the sale or exchange, (2) of a capital asset held longer than one year, (3) and be given in consideration of this sale or exchange. *See Baker*, 338 F.3d at 793.

The Trantinas argue that the termination payments satisfy this definition because the Corporate Agreement itself constituted a capital asset, and it was exchanged with State Farm for the termination payments. The United States, in turn, insists that the termination payments do not meet the definition of long term capital gain because Trantina and his corporation

court "must view the evidence in the light most favorable to the [non-moving party] and determine whether there is any genuine issue of material fact and whether the district court properly applied the relevant substantive law." *Id.* In this case, there are no disputes about the material facts; the only question is the legal question of whether the district court correctly ruled that the termination payments should be taxed as ordinary income and not as a long term capital gain.

had no property rights under the Corporate Agreement beyond the contractual obligation to perform services and be compensated for those services. Further, the government contends, even if the Corporate Agreement is deemed to be a capital asset, it was not sold or exchanged but instead was brought to an end on its own terms. We agree with the government and hold that the Corporate Agreement was not a capital asset.

[2] The code defines "capital asset" as any "property held by the taxpayer (whether or not connected with his trade or business)" excluding eight categories of property not relevant in this case.[3] 26 U.S.C. § 1221(a). A literal reading of this broad statutory language would cause every conceivable property interest, even an employment contract, to fall within the category of "capital asset," the termination of which would result in a capital gain or loss. *See United States v. Maginnis*, 356 F.3d 1179, 1181 (9th Cir. 2004); *Furrer v. Comm'r*, 566 F.2d 1115, 1117 (9th Cir. 1977) (per curiam) ("If all contracts granting rights could be considered capital assets, without inquiry into the nature of the rights granted, almost all ordinary income from salaries, wages or commissions could be transformed into capital gain."). Because of this problem, the Supreme Court has stated that "not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset." *Comm'r v. Gillette Motor Transp., Inc.*, 364 U.S. 130, 134 (1960). Instead, the Court has held that the term "capital asset" should be construed "narrowly . . . to afford capital-gains treatment only in situations typically involving the real-

---

[3]The eight categories of property statutorily excluded from capital gain treatment are inventory, real property used in the taxpayer's trade or business and all property subject to depreciation under 26 U.S.C. § 167 if used in the taxpayer's trade or business, certain copyrights and other written or musical property, accounts receivable, certain publications of the United States government, commodities derivative financial instruments held by commodities derivatives dealers, property acquired for hedging transactions, and supplies regularly used in the ordinary course of the taxpayer's business. *See* 26 U.S.C. § 1221(a)(1)-(8).

ization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." *Id.* Accordingly, whether a particular property right qualifies as a capital asset depends on the nature of the property right that the taxpayer asserts.

**[3]** The parties spend considerable time in the briefs discussing cases involving the question of whether a contractual right qualifies as a capital asset. These cases demonstrate that, when the property right asserted concerns the contractual right to perform a service and receive compensation for the service, a payment made to terminate the contract cannot be considered a capital asset unless the contract confers something more than the right to perform services or receive compensation for services performed. *See, e.g.*, *Furrer*, 566 F.2d at 1117; *Vaaler v. United States*, 454 F.2d 1120, 1122 (8th Cir. 1972) ("[T]he courts have quite uniformly held that contracts for the performance of personal services are not capital assets and that the proceeds from their transfer or termination will not be accorded capital gains treatment but will be considered to be ordinary income."); *Md. Coal & Coke Co. v. McGinnes*, 350 F.2d 293, 294 (3d Cir. 1965) (per curiam) (finding a contract giving the taxpayer an exclusive sales agency not to be a capital asset because it did not confer on the taxpayer "some interest or estate in or encumbrance upon some property with which the contract is concerned"); *United States v. Dresser Indus., Inc.*, 324 F.2d 56, 60-61 (5th Cir. 1963) (finding that the exclusive right to practice a patent did constitute a capital asset); *Nelson Weaver Realty Co. v. Comm'r*, 307 F.2d 897, 899-901 (5th Cir. 1962) (finding sale of mortgage servicing contract along with files, ledgers, and records to be a capital asset); *Dorman v. United States*, 296 F.2d 27, 29 (9th Cir. 1961) (finding that an option to become a full partner in a business venture constituted a capital asset); *Brown v. Comm'r*, 28 T.C.M. (CCH) 1330, 1332 (T.C. 1969) ("A payment in discharge of [the right to receive commissions on policies], unlinked to the policies themselves by any proprietary interest, is simply a substitute for ordinary income."). The

question in the present case is thus whether the Corporate Agreement conferred on Trantina some right or interest beyond the right to perform the services required by the agreement or to receive compensation for the services performed under the agreement.

We have addressed this issue, albeit in a slightly different context, previously. In *Furrer v. Commissioner*, the taxpayer, an insurance agent, successfully sued the insurance company for which he worked for breach of contract. 566 F.2d at 1116. The taxpayer argued that the resulting damages should be treated as capital gain and not as ordinary income because his contract rights under the agency agreement "were in themselves capital assets." *Id.* We rejected that argument, viewing the essential right under an insurance agency contract to be "the right to earn commission income." *Id.* at 1117. We concluded that "[t]his attempted transubstantiation of income into capital must fail because the essential element—the capital asset, tangible or intangible—is not present." *Id.*

More recently, the Seventh Circuit faced essentially the same situation that confronts us. In *Baker v. Commissioner*, Baker had received termination payments under an agency agreement with State Farm that was nearly identical to the Corporate Agreement in this case. 338 F.3d at 791-92. Baker reported the termination payments that State Farm made under the agreement as long term capital gain on his 1997 federal income tax return. *Id.* at 792. The Commissioner of Internal Revenue ("Commissioner") issued a notice of deficiency to Baker, finding that the State Farm termination payments constituted ordinary income, not capital gain. Baker contested the ruling in the Tax Court, which found for the Commissioner. *Id.*

[4] On appeal to the Seventh Circuit, Baker contended that the termination payments were in consideration of the goodwill he established over his thirty-four year career. *Id.* at 793. The Seventh Circuit rejected his arguments and agreed with

the Tax Court's finding. Citing a provision in Baker's agency agreement with State Farm reserving to State Farm all property rights over the policies and policyholder information, the court wrote that "[b]ecause Warren Baker did not own any property related to the policies, he could not sell anything." *Id.* As a result, the court found that Baker had not sold or exchanged a capital asset; his termination payments were therefore ordinary income. *See id.* at 794.

**[5]** We adopt the reasoning of the Seventh Circuit. A precondition to realizing a long-term capital gain is the ownership of a capital asset. Yet under the express terms of Trantina's Corporate Agreement with State Farm, Trantina simply had no property that could be sold or exchanged. The Corporate Agreement contains a provision nearly identical to the one that the *Baker* court found to be controlling. Trantina's Corporate Agreement states:

> Information regarding names, addresses, and ages of policyholders of the Companies; the description and location of insured property; and expiration or renewal dates of State Farm policies acquired or coming into the Agent's possession during the effective period of this Agreement, or any prior agreement, except information and records of policyholders insured by the Companies pursuant to any governmental or insurance industry plan or facility, are trade secrets wholly owned by the Companies. All forms and other materials, whether furnished by State Farm or purchased by the Agent, upon which this information is recorded shall be the sole and exclusive property of the Companies.

Given this blanket reservation of all property rights to State Farm, it is unclear exactly what Trantina could have sold or exchanged. Trantina could not sell back to State Farm something that it already owned.

Trantina attempts to distinguish *Baker* by noting that Baker argued that Baker's termination payments were made in consideration of the sale of goodwill, while Trantina does not rest on this argument. The *Baker* court did find that the termination payments could not be characterized as payments for goodwill. *See Baker*, 338 F.3d at 793-94. But the holding in *Baker* extended beyond goodwill; the *Baker* court found that Baker did not own *anything* under the agreement and therefore could not sell anything, *not even* goodwill. *See id.* at 794 ("Baker owned nothing. Thus, he could sell no assets, including goodwill.").

Trantina attempts to avoid the plain language of the Corporate Agreement by characterizing the Corporate Agreement itself as a capital asset that was exchanged with State Farm for the termination payments when Trantina retired. On this theory, Trantina had "rights and interests in valuable assets, the managed insurance policies," which he asserts gave him "some interest or estate in or encumbrance upon some property with which the contract is concerned." *Md. Coal & Coke Co.*, 350 F.2d at 293.

Yet this characterization of the Corporate Agreement does not fit with the express terms of the agreement. As noted above, Trantina did not have any property rights in the policies under the express terms of the agreement. The policies, including all identifying information which might have been taken or conveyed to another insurance agency, belonged to State Farm, not Trantina. Furthermore, the Corporate Agreement expressly forbade Trantina from transferring or assigning his interest in the Agreement itself. Section VI.B of the Corporate Agreement states that

> neither the Agreement nor any interest thereunder can be sold, assigned, or pledged; and no right in any sum due or to become due to the Agent hereunder can be sold, assigned, or pledged without the prior written consent of the Companies.

To quote the district court, "[t]he suggestion that the Corporate Agreement is itself an asset, when it declares that all assets pertaining to Plaintiffs' insurance agency belong to State Farm, is paradoxical." *Trantina*, 381 F. Supp. 2d at 1106. It is likewise paradoxical to suggest that the Corporate Agreement was an asset when the agreement itself stated that it could not be sold or otherwise exchanged.

**[6]** Instead, the better view of the termination payments is that they were made *pursuant to*, not in exchange for, the Corporate Agreement. As the government points out, the Corporate Agreement obligated Trantina to perform certain services, such as soliciting and servicing insurance policies. Trantina was compensated for these services through commission payments under the agreement, and he was permitted to continue as State Farm's agent as long as the agreement remained in effect. Trantina only became entitled to the contractual termination payments after he complied with two additional conditions in the agreement: He was required to return all of State Farm's property and he was required to comply with a twelve-month non-compete agreement. The Seventh Circuit reached a similar conclusion in *Baker*, finding that the termination payments were made at least in part for the non-compete agreement, which is taxed as ordinary income. *See Baker*, 338 F.3d at 794 ("We agree . . . that (a portion of) State Farm's payments were for a covenant not to compete. . . . [T]he consideration a buyer pays a seller for a covenant not to compete is taxable as ordinary income." (citations omitted)).

Trantina points to several aspects of the agreement as evidence that he had enforceable rights beyond a contractual right to perform services for State Farm and receive compensation for those services. For example, Trantina argues that State Farm could not have arbitrarily reassigned to another agent the policies that the Trantina Insurance Agency had generated because "State Farm recognized Trantina held valuable interests in the policies." To support this contention, Trantina curiously points to a provision that imposed an obli-

gation upon himself, not upon State Farm. The agreement provides that "[t]he Agent will respect the rights and interests of other agents in policies credited to their accounts by refraining from raiding or otherwise diverting policies from their accounts to the Agent's account." In the agreement, however, the term "Agent" refers to Trantina, not to State Farm. The quoted provision thus imposed a duty on *Trantina* not to raid other agents' customers for his own account (and presumably State Farm placed a similar duty on all of its other agents). However, the provision says nothing about Trantina's ability to prevent *State Farm* from assigning the policies to other agents.

Trantina also highlights a provision in the Corporate Agreement that permitted him to release to State Farm one-quarter of the policies assigned to his account as evidence that he had some property interest in the policies beyond the right to receive compensation or perform services. Yet this provision demonstrates only that Trantina could obtain an early, partial release from his obligations to service the policies, not that he possessed any property right in the policies themselves.

Trantina points to no other provision of the agreement that gave him the ability to prevent State Farm from reassigning the policies. The Corporate Agreement actually expressly provides that "[t]he Agent or State Farm have the right to terminate this Agreement by written notice." So, contrary to Trantina's arguments, State Farm in fact *did* retain the power to reassign, through termination of the agreement, all of Trantina's insurance policies.

Trantina does point to the covenant of good faith and fair dealing implied in every contract under Arizona law as evidence that he possessed some interest greater than the right to perform services for and receive commissions from State Farm. But this argument proves too much: Assuming that such a requirement exists under Arizona law, its existence would not transform every contract for services into a capital

asset. If we were to accept Trantina's argument, the same could be said of *every* services contract, and the result would be contrary to our instructions under *Gillette Motor Transport*. Simply because Trantina may have been able to enforce his rights under the contract through a breach of contract action if State Farm had transferred all of his policies to a different agent does not mean that the contract was a capital asset.[4]

Trantina also argues that the Corporate Agreement is not properly characterized as a personal services contract because he was permitted to hire employees to help him fulfill the terms of the agreement. This argument is inapposite. A contract for personal services can permit the obligor to enlist the assistance of others to fulfill the contractual duties. The duties and obligations of Trantina under the Corporate Agreement clearly indicate that the Corporation contracted with State Farm to provide services to State Farm, namely, the sale and servicing of insurance policies.

Trantina asserts that the rights he possessed under the Corporate Agreement are the type of property that Congress intended to tax at the capital gains rate because he made a "substantial economic investment in the Agreement" that "increased over the years." The basis for this investment, Trantina argues, is the economic opportunity cost that he incurred when he decided to pursue a career as an insurance agent instead of something else. This argument sweeps far too broadly. Every individual incurs an opportunity cost when he or she decides to take one course of action instead of another. To use opportunity cost as the basis for a capital investment would render not only every employment contract, but also every economic exchange, a capital asset.

Finally, Trantina incorporates by reference the argument of

---

[4]Further, we have held in the past that damages obtained from a successful breach of agency contract action against an insurance company are taxable as ordinary income. *See Furrer*, 566 F.2d at 1116.

the amici that the substance of the Corporate Agreement was essentially a franchise, which is recognized as a capital asset. *See* 26 U.S.C. § 197 (including franchise within the definition of intangible property). However, Trantina's oblique reference in his reply brief to the brief of the amicus curiae is the first time this argument is mentioned. It was not raised in the district court. It has therefore been forfeited. *See Int'l Union of Bricklayers & Allied Craftsmen Local Union No. 20, AFL-CIO v. Martin Jaska, Inc.*, 752 F.2d 1401, 1404 (9th Cir. 1985).

## III.   CONCLUSION

**[7]** Because we conclude that Trantina did not have any property rights that he could sell under the express terms of the Corporate Agreement, the termination payments were properly characterized as ordinary income. The grant of summary judgment to the United States was proper. The judgment of the district court is

AFFIRMED.