James F. and Connie B. ALDERSON; Justin W. and Kristen N. Alderson; and Jennifer A. and Walter Page, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. CV09–6155 SVW (MLGx).

United States District Court, C.D. California.

May 27, 2010.

---

David B. Porter, Robert Warren Wood, Wood & Porter, San Francisco, CA, for Plaintiffs.

Thomas Derrick Coker, AUSA—Office of U.S. Attorney, Los Angeles, CA, for Defendant.

### ORDER GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT [11]; DENYING PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT [17]

STEPHEN V. WILSON, District Judge.

## I. INTRODUCTION

Plaintiffs seek to obtain a tax refund by characterizing their False Claims Act *qui tam* award as capital gains rather than ordinary income. Plaintiffs' Complaint presents a question of first impression

## II. FACTS

Plaintiff Jim Alderson was the Chief Financial Officer for the North Valley Hospital in Whitefish, Montana. Beginning in 1990, Quorum Health Group, Inc. ("Quorum") took over management of the hospital. Quorum instructed Alderson to retain two sets of cost reports: one to submit to the federal government's Medicare program when seeking reimbursements and another to submit to the hospital's auditors. Quorum requested that the Medicare books contain more aggressive cost reporting in order to increase the amount of proceeds received from Medicare.

When Alderson refused to maintain the separate sets of books, he was fired. He then brought a wrongful termination action, which settled in late 1993. In the course of discovery during the wrongful termination proceedings, certain Quorum officials' testimony suggested that Quorum was engaged in Medicare fraud.

In January 1993, Alderson filed a *qui tam* False Claims Act action against Quorum and related entities. The Department of Justice interviewed Alderson about the lawsuit in 1993, and ultimately decided to intervene in the action five years later. The United States then severed the actions against Quorum and its affiliate Hospital Corporation of America ("Hospital Corporation").[1] The present lawsuit only relates to the *qui tam* action against Hospital Corporation.

In 1999, Alderson formed the Alderson Family Limited Partnership and transferred to the partnership 40% of his interest in the *qui tam* claim against Hospital Corporation. Alderson then transferred 49% shares in the Alderson Family Limited Partnership to each of his children and retained 1% shares in the Alderson Family Limited Partnership for himself and his wife.[2] In order to calculate the gift taxes owed on the transfer to the children, Alderson hired an appraiser to estimate the value of the *qui tam* claim. Plaintiffs submit evidence showing that the appraiser valued the claim at slightly more than $3,000,000.

In June 2003, the United States and Hospital Corporation settled the False Claims Act suit involving Medicare fraud. The district court awarded Plaintiff 16% of the settlement proceeds. Plaintiffs received a total of $27,105,035 as a result of the settlement.

After receiving these funds, all of the Plaintiffs initially reported their *qui tam* recovery as ordinary income. They now seek to recharacterize the income as capi-

---

1. *See United States ex rel. Alderson v. Quorum Health Group, Inc.*, 171 F.Supp.2d 1323, 1337 n. 40 (M.D.Fla.2001) (discussing history of the litigation).

2. Alderson, his wife, and his children and their spouses are collectively referred to as "Plaintiffs."

tal gains. They have satisfied the procedural prerequisites for bringing the present action seeking a refund.

## III. LEGAL STANDARD

The parties have filed cross-motions for summary judgment. If there were factual disputes, the taxpayer would bear the initial burden of showing that its legal contentions were supported by the evidence; following that initial showing, the burden would shift to the Government. Fed. R.Civ.P. 56(c); 26 U.S.C. § 7491; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–24, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). However, "[i]n this case, there are no disputes about the material facts; the only question is the legal question of whether ... the [*qui tam* recovery] should be taxed as ordinary income [or] as a[ ] capital gain." *See Trantina v. United States*, 512 F.3d 567, 570 n. 2 (9th Cir.2008).

Based on the undisputed facts stated above, the Court reaches the following legal conclusions.

### A. False Claims Act

In order to fully understand the nature of Plaintiffs' recovery under the False Claims Act, it is necessary to briefly summarize the False Claims Act's structure and purpose.

The False Claims Act establishes liability for "[a]ny person" who "knowingly presents, or causes to be presented, to an officer or employee of the United States Government ... a false or fraudulent claim for payment or approval." *Vermont Agency of Natural Resources v. United States ex rel. Stevens*, 529 U.S. 765, 769, 120 S.Ct. 1858, 146 L.Ed.2d 836 (2000) (quoting 31 U.S.C. § 3729(a)). Liability is established either by way of a direct suit brought by the Government or a *qui tam* suit brought by a private plaintiff. *Id.* (citing 31 U.S.C. § 3730(a)-(b)(1)).

In a *qui tam* suit, the private plaintiff (known as a "relator") must file the suit under seal and provide the Government a copy of the pleadings and supporting evidence. *Id.* (citing 31 U.S.C. § 3730(b)(2)). The Government must decide whether to intervene in the action within sixty days; if the Government initially declines to intervene, it may intervene at a later time upon a showing of good cause. *Id.* (citing 31 U.S.C. § 3730(b)-(c)).

If the Government fails to intervene and the relator successful proceeds to judgment, the relator is entitled to receive 25 to 30 percent of the recovery (plus fees and costs) and the Government receives the remainder. *Id.* at 770, 120 S.Ct. 1858 (citing 31 U.S.C. § 3730(d)(2)). If the Government intervenes and the action is "based primarily on disclosures" contained in government reports or news accounts, the relator may recover zero to ten percent of the final judgment, but only if the relator possessed "direct and independent knowledge of the information" upon which the suit was based. *See* 31 U.S.C. § 3730(d)(1), (e)(4); *Graham County Soil and Water Conservation Dist. v. United States ex rel. Wilson,* —— U.S. ——, 130 S.Ct. 1396, 1402–04, 176 L.Ed.2d 225 (2010); *Rockwell Intern. Corp. v. United States,* 549 U.S. 457, 127 S.Ct. 1397, 167 L.Ed.2d 190 (2007). If the Government intervenes and the relevant information was not publicly disclosed prior to the lawsuit, the relator may recover fifteen to twenty-five percent of the of the final judgment. *Vermont Agency of Natural Resources,* 529 U.S. at 769–70, 120 S.Ct. 1858 (citing 31 U.S.C. § 3730(d)(1)).

The Supreme Court has explained that the relator obtains Article III standing because "the assignee of a claim has standing to assert the injury in fact suffered by the assignor." *Id.* at 773, 120 S.Ct. 1858. Under this framework, "[t]he [False

Claims Act] can reasonably be regarded as effecting a partial assignment of the Government's damages claim." *Id.* Therefore, "the relator's bounty" is not merely "the fee he receives out of the United States' recovery for" his services of "filing and/or prosecuting a successful action on behalf of the Government." *See id.* at 772, 120 S.Ct. 1858. Rather, as the Court explained, in addition to the relator's recovery based on his **services,** the False Claims act—like all *qui tam* actions—"allow[s] informers to obtain a portion of the penalty as a bounty for their **information.**" *Id.* at 775, 120 S.Ct. 1858 (emphasis added); *see also id.* at 776 & nn. 5–7, 120 S.Ct. 1858 (noting history in United States of "several **informer** statutes expressly authorizing *qui tam* suits").

■ Numerous other courts have characterized the False Claims Act's *qui tam* provision in various ways, but the common core of their characterizations is that the relator receives a portion of the Government cause of action in exchange for the relator's information and (in some cases) services. The Ninth Circuit has stated that the law "operate[s] as an enforceable unilateral contract" which is "accepted by the relator upon filing suit." *United States ex rel. Kelly v. Boeing Co.,* 9 F.3d 743, 748 (9th Cir.1993). The Fifth Circuit has explained that, through the Act, "the government seeks to purchase information it might not otherwise acquire." *United States ex rel. Russell v. Epic Healthcare Management Group,* 193 F.3d 304, 309 (5th Cir.1999); *see also United States ex rel. Hebert v. Dizney,* 295 Fed.Appx. 717, 723 (5th Cir.2008) (same) (citable pursuant to Fed. R.App. P. 32.1(a)). The Federal Circuit and the Tax Court have described the *qui tam* payment as a "reward" provided in exchange for the relator's "efforts," *Roco v. Comm'r,* 121 T.C. 160, 165 (2003), and for "successfully bringing suit on behalf of the government." *SKF USA, Inc. v. United States Trade Comm'n,* 556 F.3d 1337, 1355–56 (Fed.Cir.2009). The payment "is a financial incentive for a private person to **provide information** and **prosecute claims** relating to fraudulent activity." *Id.* (citations omitted) (emphasis added).

In short, the overwhelming weight of the caselaw holds that a False Claims Act *qui tam* award is given in exchange for **information** and **services.**

To the extent that there is any doubt about the nature of the *qui tam* award, it is helpful to focus on the language of the statute, which plainly establishes that the award is a payment in exchange for the relator's information and services. The statute provides three levels of recovery to the relator. If the *qui tam* suit is "based primarily on disclosures of specific information" disclosed in a government report or the news media, the relator is entitled to up to ten percent of the recovery based on "the significance of the information [provided by the relator] and the role of the [relator] in advancing the case to litigation." 31 U.S.C. § 3730(d)(1). If the suit is based on nonpublic information and the Government intervenes, then the relator is entitled to 15 to 25 percent "depending upon the extent to which the person substantially contributed to the prosecution of the action." *Id.* If the Government does not intervene and the relator is solely responsible for prosecuting the action, then the relator is entitled to recover 25 to 30 percent of the recovery. 31 U.S.C. § 3730(d)(2).

In short, the *qui tam* award—whether it is viewed as a contract between the relator and the Government, a bounty, a reward, or something different—is based entirely on the relator's information and personal efforts. As stated by the Ninth Circuit: "the extent of the recovery is tied to the importance of the relator's participation in the action and the relevance of the infor-

mation brought forward." *United States ex rel. Green v. Northrop Corp.*, 59 F.3d 953, 964 (9th Cir.1995); *accord Black's Law Dictionary* 211, 1435 (9th ed.2009) (defining "bounty" as a payment given "to induce someone to take action or perform a service," and defining "reward" as a payment given in return for services (such as recovering property) or information (such as information used to capture a criminal)).

## B. Capital Gains Treatment

■ The parties do not dispute that the *qui tam* award is taxable income. That question appears to be settled. *See Brooks v. United States*, 383 F.3d 521 (6th Cir.2004) (holding that False Claims Act award is taxable income); *Campbell v. Comm'r*, 134 T.C. No. 3 (2010) (same); *Roco v. Comm'r*, 121 T.C. 160 (2003) (same). Here, the dispute is whether or not the award is characterized as a capital gain or as ordinary income.

### 1. Basic Principles of Capital Gains

Half a century ago, the Supreme Court established the basic structure for determining if capital gains treatment is appropriate:

> Long-established principles govern. the application of the more favorable tax rates to long-term capital gains: (1) There must be first, a 'capital asset,' and second, a 'sale or exchange' of that asset; (2) 'capital asset' is defined as 'property held by the taxpayer,' with certain exceptions not here relevant; and (3) for purposes of calculating gain, the cost or other basis of the property must be subtracted from the amount realized on the sale or exchange.

*Comm'r v. Gillette Motor Transport, Inc.*, 364 U.S. 130, 133–134, 80 S.Ct. 1497, 4 L.Ed.2d 1617 (1960) (internal citations omitted) (quoting predecessor of 26 U.S.C. ("I.R.C.") § 1221).

The principal concern in the present action is the second point in the list: the definition of "capital asset." The Tax Code provides the following definition: "For purposes of this subtitle, the term 'capital asset' means property held by the taxpayer (whether or not connected with his trade or business)." I.R.C. § 1221(a).[3]

### 2. The "Property" Requirement

■ "[T]he first step in determining whether the sale or exchange of an asset receives capital treatment is deciding whether or not the asset is property." Scott Shimick, 4 *Mertens Law of Federal Income Taxation*, § 22:4 (May 2010 update) ("*Mertens*"). When defining the scope of the term "property," state law is instructive but not determinative because the Tax Code is a creature of federal, not state, law. *See Miller v. Comm'r*, 299 F.2d 706, 708 (2d Cir.1962); *Mertens* § 22:4. In determining whether a property right exists, "[t]he ordinary technique is to refer to principles of state property law for, if not an answer, at least a hint. Since ultimately it is the Congressional purpose which controls, such non-tax definitions are certainly not binding on us. On the other hand, Congress may be presumed to have had ordinary property concepts in mind so they are relevant to our inquiry." *Miller*, 299 F.2d at 708.

The leading case on this issue is *Miller v. Comm'r*, in which the Second Circuit held that "publicity rights" were not "property" and, as such, the sale of those publicity rights could not receive capital gains treatment. The case involved Glenn Miller's widow, who had sold the rights to

---

**3.** The Tax Code's definition of "capital asset" provides eight exceptions that are not at issue in this case. *See* I.R.C. § 1221(a)(1)-(8).

produce the movie *The Glenn Miller Story* to Universal Pictures. *Id.* at 707. The court explained that "at the time of the 'sale' there were no clear-cut decisions protecting publicity rights of a deceased celebrity," and there was no authority to support the proposition that "the reputation or fame of a dead person could give rise to ... 'property rights.'" *Id.* at 709 (internal quotations and alterations omitted). Accordingly, the "sale" of these "rights" was not a sale of a legally recognized form of property. Rather, Universal Pictures had merely purchased a hedge against the "chance that a new theory of 'property' might be advanced [in the future], and that a lawsuit predicated on it might be successful." *Id.* at 710. The court concluded: "We do not believe that for income tax computation purposes the beneficiaries of the estate of a deceased entertainer received by descent a capitalizable 'property' in the name, reputation, right of publicity, right of privacy or 'public image' of the deceased; or that in this case the petitioner, for tax purposes, owned any 'property' which came into existence after Glenn Miller's death." *Id.* at 711. Absent the exchange of any "property" interest, the payment from Universal was accordingly treated as ordinary income rather than capital gains. *Id.; see also Estate of Scharf v. Comm'r*, 38 T.C. 15, 28–29 (1962) (holding that the sale of a "membership certificate" in a non-profit hospital, which represented only the right to participate in management of hospital, was not a sale of "property").

More recently, the Ninth Circuit has explained that, even where "property" exists, that property must have been owned by the taxpayer prior to being "sold" or "exchanged" for tax purposes. *Trantina v. United States*, 512 F.3d 567. The court examined an agency agreement between an insurance company and the taxpayer (who was an insurance agent). The court concluded that the taxpayer was not enti-tled to capital gains treatment with respect to his purported sale of intangible assets such as customer lists and goodwill to the insurance company. Per the terms of the parties' agency agreement, ownership of these intangible assets was retained by the insurance company rather than the taxpayer. In other words, the taxpayer "simply had no property that could be sold or exchanged" for purposes of receiving capital gains treatment. *Id.* at 573.

In short, without any property, there can be no capital asset; and without any capital asset, there can be no capital gains.

### 3. The "Capital Asset" Requirement

■ If it is established that some form of "property" is at issue, the Court must further determine whether the property constitutes a "capital asset."

The Supreme Court has explained that, although the Tax Code defines "capital asset" as "property held by the taxpayer," *see* I.R.C. § 1221(a), "it is evident that not everything which can be called property in the ordinary sense and which is outside the statutory exclusions qualifies as a capital asset." *Gillette*, 364 U.S. at 134, 80 S.Ct. 1497. The Court continued: "This Court has long held that the term 'capital asset' is to be construed narrowly in accordance with the purpose of Congress to afford capital-gains treatment only in situations typically involving the realization of appreciation in value accrued over a substantial period of time, and thus to ameliorate the hardship of taxation of the entire gain in one year." *Id.*

Accordingly, in *Gillette*, the Court held that the taxpayer's receipt of rent to use its business facilities was not a "capital asset" for taxation purposes. The case involved the following facts. The government had temporarily seized a motor carrier's transportation facilities during World War Two. *Id.* at 130–31, 80 S.Ct. 1497. Pursuant to the Fifth Amendment Takings

Clause, the government compensated the taxpayer for the temporary taking of the property. *Id.* at 132–33, 80 S.Ct. 1497. The Supreme Court was then asked to determine the appropriate tax treatment of this compensation. The Court explained that the government had seized the "right to use" the facilities rather than the physical facilities themselves. *Id.* at 135, 80 S.Ct. 1497. The Court accordingly held that, although the taxpayer's "right to use its facilities was held to be a valuable property right compensable under the requirements of the Fifth Amendment ...., that right was not a capital asset within the meaning of" the capital gains provisions of the Tax Code. *Id.* at 135, 80 S.Ct. 1497. The Court justified its conclusion by reference to two basic facts: first, the "right" to use the facilities was "not something in which [the taxpayer] had any investment" of capital; second, the right to use the facilities "is manifestly not of the type which gives rise to the hardship of the realization in one year of an advance in value over cost built up in several years, which is what Congress sought to ameliorate by the capital-gains provisions." *Id.*[4]

Over time, the Ninth Circuit has distilled the Supreme Court's discussion in *Gillette* into a clear but flexible framework: "The essence of a capital transaction within the tax statutes and decided cases is that the sale or exchange of an asset results in a return of a capital investment coupled with realized gain or loss (as the case might be) which accrues to the investment over a certain period of time." *Holt v. Comm'r,* 303 F.2d 687, 691 (9th Cir.

1962). In one of its two most recent cases on the subject, the Ninth Circuit treated *Gillette* as setting forth two factors that can be "crucial" to determining whether capital gains treatment is appropriate: (1) whether the taxpayer "ma[d]e any underlying investment of capital in return for the receipt of" the purported capital asset, and (2) whether "the sale of [t]his right ... reflect[s] an accretion in value over cost to any underlying asset ... held" by the taxpayer. *United States v. Maginnis,* 356 F.3d 1179, 1183 (9th Cir.2004). (After establishing this test, the court then added that "we do not hold that [these factors] will be dispositive in all cases.")

In applying this test, the Ninth Circuit has explained that a taxpayer's economic opportunity costs are not an "investment of capital." In *Trantina,* the taxpayer argued that "he made a substantial economic investment in [his employment] Agreement that increased over the years." 512 F.3d at 575. This argument was based on "the economic opportunity cost that he incurred when he decided to pursue a career as an insurance agent instead of something else." *Id.* The court rejected this argument, explaining that "[t]his argument sweeps far too broadly. Every individual incurs an opportunity cost when he or she decides to take one course of action instead of another. To use opportunity cost as the basis for a capital investment would render not only every employment contract, but also every economic exchange, a capital asset." *Id.*

---

4. Plaintiffs attempt to avoid the *Gillette* court's narrow reading of "capital asset" by pointing to the Supreme Court's later statement to the effect that the term "capital asset" refers to any and all property not listed in the eight statutory exclusions of I.R.C. § 1221. *See Arkansas Best Corp. v. Comm'r,* 485 U.S. 212, 217–18 & n. 5, 108 S.Ct. 971, 99 L.Ed.2d 183 (1988). This argument is unavailing. The Ninth Circuit has explained that *Arkansas Best* "dealt with a different subject entirely," *United States v. Maginnis,* 356 F.3d 1179, 1186 (9th Cir.2004), and has continued to apply the *Gillette* Court's narrow reading of "capital asset." *See Trantina v. United States,* 512 F.3d 567, 571 (9th Cir. 2008).

In other words, in order for property to be characterized as a "capital asset," there must first be an investment of "capital" in that asset.

### 4. Remaining Principles

 A few additional principles must also be mentioned. A taxpayer's sale or exchange of a *contract* is not necessarily a sale or exchange of "property." *Trantina,* 512 F.3d at 571–72. Rather, the court must examine the "the nature of the rights granted" by the contract. *Furrer v. Comm'r,* 566 F.2d 1115, 1117 (9th Cir.1977) (per curiam). In a similar vein, payments "made pursuant to, not in exchange for" a contract are not capital gains. *Trantina,* 512 F.3d at 574 (emphasis in original).

 Likewise, a taxpayer's sale or exchange of a *cause of action* is not necessarily a sale or exchange of "property." Rather, the court must scrutinize and the "nature of the claims asserted" in the lawsuit. *Furrer,* 566 F.2d at 1117.

At the heart of these conclusions are the doctrines that courts must look to the substance rather than the form of a transaction, and courts must look to the "origin of the claim" when determining how to characterize it. Courts must reject a taxpayer's "attempted transubstantiation of income into capital" where "the essential element—the capital asset, tangible or intangible—is not present." *Id.*

## IV. DISCUSSION

The thrust of Plaintiffs' argument is contained in the opening of their Motion for Summary Judgment:

> Under applicable law, an exchange of secret information and know-how in return for cash or property is a capital transaction. In 1993, Alderson exchanged a capital asset in the form of information and know-how for a capital asset in the form of his *qui tam* claim and its corresponding contract rights. Thereafter, in 2003, Alderson (and the Alderson Family Limited Partnership) released the Claim and its corresponding contract rights for a cash relator share. This cash payment consummated the disposition of a capital asset.

(Pls.' Mot. at 2, internal citations and abbreviations omitted).

As will be explained *infra,* Plaintiffs' argument fails because its very premise—that Alderson possessed a capital asset in the form of "secret information and know-how"—is incorrect. It is true, of course, that Alderson provided information to the Government. However, that information was neither "property" nor a "capital asset" for purposes of the Tax Code. Absent any "property" that is a capital asset, there necessarily cannot be any capital gains. *See* I.R.C. § 1221.

### A. The Parties' Arguments

First, it is helpful to lay out the purported mechanics of the transactions at issue.

Plaintiffs assert that "Alderson possessed property in the form of: (1) information and know-how he transferred to the government in exchange for his Claim; (2) the Claim itself; and/or (3) the contract rights encompassed by the Claim." (Pls.' Mot. at 9 n. 15.)

Plaintiffs assert that Alderson's first capital transaction occurred when he exchanged "secret information and know-how" to the Government in exchange for a portion of the False Claims Act recovery. (*Id.* at 9.) According to Plaintiffs, this "secret information" and "know-how" was a capital asset because it was valuable secret information.

Plaintiffs further argue that, once Alderson received his portion of the *qui tam* claim, he still possessed a capital asset because "case law treats a cause of action or 'chose in action' as intangible personal property and a capital asset." (Pls.' Mot.

at 15.) "Alderson's [*qui tam*] Claim encompassed contract rights to a relator share" of the final recovery. (*Id.*) These contract rights, according to Plaintiffs, were also capital assets, because "[m]any contract rights receive capital gains treatment upon their disposition." (*Id.* at 16.) The final "disposition" of this contract right occurred when Plaintiffs ultimately received a 16% award from the District Court at the end of the False Claims Act litigation. (*Id.*)

Plaintiffs correctly point out that the relevant inquiry is to look at the "origin of the claim" to determine whether the ultimate recovery is ordinary income or capital gains. (*Id.* at 17.) Substantial caselaw supports this view. *E.g., United States v. Gilmore,* 372 U.S. 39, 47–49, 83 S.Ct. 623, 9 L.Ed.2d 570 (1963); *Getty v. Comm'r,* 913 F.2d 1486, 1491 (9th Cir.1990). Plaintiffs also correctly point out that "[t]he origin of Alderson's Claim was his secret information and know-how and rights to its value." (Pls.' Mot. at 17.) Based on these basic premises, Plaintiffs contend that because the information and know-how were capital assets, the property received by Alderson in exchange for that information and know-how—that is, the False Claims Act cause of action and/or the contractual right to a portion of the False Claims Act recovery—also constituted capital assets. (*Id.*)

Plaintiffs' entire line of argument rests on a shaky foundation. As described in further detail *infra,* Alderson's purported "know-how" and "secret information" simply do not constitute "property" under any applicable body of law.

The Government correctly argues that "Plaintiffs' allegations beg the question[ ]: how does an individual acquire a proprietary interest in *knowledge* of fraudulent and unlawful conduct[?]" (Defs.' Mot. at 10, emphasis in original.) Likewise, the Government contends that "Alderson ...

discovered illegal activity and disclosed it to obtain a handsome reward. The contention that information about illegal activity is equivalent to having knowledge of a 'trade secret' is wholly without merit.... Neither authority, nor logic nor common sense support the conclusion that an individual's knowledge about illegal conduct constitutes a property interest or a capital asset." (Defs.' Reply at 6.)

This threshold question—whether there is any "property"—is central to this case. If Plaintiffs lack a property interest in the information that formed the basis of the False Claims Act claim, then Plaintiffs are necessarily prohibited from seeking capital gains treatment. *See* I.R.C. § 1221(a) (defining "capital asset" as "any property" held by the taxpayer); *see also Trantina,* 512 F.3d at 573.

**B. The Nature of Property Rights**

■ With respect to Plaintiffs' apparent argument that information *qua* information is "property," this argument fails. In order to possess a property right, whether tangible or intangible, a person must be able to exclude others from using or taking the purported property. As explained by the Supreme Court, "[t]he right to exclude others is generally one of the most essential sticks in the bundle of rights that are commonly characterized as property." *Ruckelshaus v. Monsanto Co.,* 467 U.S. 986, 1011, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (citation and quotations omitted); *see also Kaiser Aetna v. United States,* 444 U.S. 164, 179–80, 100 S.Ct. 383, 62 L.Ed.2d 332 (1979) ("[T]he 'right to exclude[ ]' [is] universally held to be a fundamental element of the property right.") (quoting, inter alia, *Int'l News Svc. v. Ass'td Press,* 248 U.S. 215, 250, 39 S.Ct. 68, 63 L.Ed. 211 (1918) (Brandeis, J., dissenting) ("[a]n essential element of individual property is

the legal right to exclude others from enjoying it.")).

This general principle is an element of all the relevant bodies of law.[5] This principle is supported by federal law as stated by the Supreme Court (which is relevant because this case involves the Internal Revenue Code), Montana (which is potentially relevant because that is where Plaintiff was employed), Florida (which is potentially relevant because that is where Hospital Corporation was located and where the False Claims Act suit was litigated) and California (which is potentially relevant because it is where Plaintiffs currently reside, *see* Compl. ¶ 2).

The Ninth Circuit has distilled a three-part test for determining whether a property right exists: "First, there must be an interest capable of precise definition; second, it must be capable of exclusive possession or control; and third, the putative owner must have established a legitimate claim to exclusivity." *G.S. Rasmussen & Assocs., Inc. v. Kalitta Flying Serv., Inc.*, 958 F.2d 896, 903 (9th Cir.1992), *cert. denied* 508 U.S. 959, 113 S.Ct. 2927, 124 L.Ed.2d 678 (1993); *see also Kremen v. Cohen*, 337 F.3d 1024, 1030 (9th Cir.2003) (same). Although this test is derived from California state law, it is based on well-

established principles that are fundamental to the common law conception of property.

The Ninth Circuit's test is consistent with the other relevant bodies of law. The *Rasmussen* three-part framework has been explicitly adopted as an accurate statement of Montana law. *Berger v. Cable News Network Inc.*, No. CV 94–46–BLG–JDS, 1996 WL 390528, at *4 (D.Mont. Feb. 26, 1996).[6] Furthermore, this three-part test is consistent with the federal courts' interpretation of property rights under Florida law.[7] In *Morris Comms. Corp. v. PGA Tour, Inc.*, 235 F.Supp.2d 1269, 1281 (M.D.Fla.2002), the court held that the PGA Tour (a professional golf association) held a property right in scores of golf matches that had been compiled in real-time. The court explained that this property right was premised on the fact that the "PGA Tour controls the right of access to that information and can place restrictions on those attending the private event" to prevent them from disseminating the information. *Id.* The court also noted that this "property right vanishes when the scores are in the public domain." *Id.*[8] This analysis is consistent with the Ninth Circuit's three-part test, and like the Supreme Court's cases focuses on the importance of *excluding*

---

**5.** As explained by the Second Circuit in *Miller* and by the author of Mertens, the Tax Code creates a federal law of "property" that is distinct from (but necessarily must refer to) state law. *See Miller v. Comm'r*, 299 F.2d at 708; *Mertens* § 22:4.

**6.** It is especially appropriate for the Montana courts to apply California's definition of property given that both the California and Montana Civil Codes define property in the following manner: "The ownership of a thing is the right of one or more persons to possess and use it to the exclusion of others." Cal. Civ. Code § 654; Mont.Code Ann. § 70–1–101.

**7.** As a general matter, Florida is a common law state that has adopted the general rules of

the common law and can be expected to follow the United States Supreme Court's basic definition of "property." *See* Fla. Stat. Ann. § 2.01.

**8.** On appeal, the Eleventh Circuit summarily affirmed the District Court's conclusion. The court stated that "PGA has a right to control its property interest in ... the compiled golf scores," and that "[w]e agree with the district court that PGA 'has a right to sell or license its product, championship golf, and its derivative product, compiled golf scores.'" *Morris Comms. Corp. v. PGA Tour, Inc.*, 364 F.3d 1288, 1296 & n. 13 (11th Cir.2004) (quoting District Court).

third parties from accessing the "property."

In other words, all of the potentially relevant bodies of law—the general common law as interpreted by the United States Supreme Court; California law as interpreted by the Ninth Circuit; Montana law as interpreted by the federal district court in that state; and Florida law as interpreted by the federal courts in that state—hold that property rights only exist if the person asserting the property right has a legitimate claim to the exclusive possession of that right and is capable of excluding others from such possession.

## C. Under General Principles of Property Law, Alderson Did Not Possess a Property Right

Here, it is clear that Alderson did not have the right to exclude others from obtaining his "secret information" and "know-how." The "secret information" and "know-how" was nothing more than the knowledge that Alderson's employer was engaged in wrongdoing. Alderson's "information" and "know-how" was also known by Alderson's employer, Quorum Health Group. Indeed, *Plaintiffs* have introduced the undisputed fact that "Quorum's district vice-president informed Alderson of Quorum's policy to keep two sets of cost reports: an aggressive report to submit to Medicare for cost reimbursement; and a reserve report to submit to Quorum's auditors." (Pls. SUF ¶ 3.) Plaintiffs have also introduced the undisputed fact that, "[d]uring discovery [in Alderson's 1991 wrongful termination action], Alderson deposed certain Quorum officials, whose testimony suggested improprieties in its cost reporting policies." (Pls. SUF ¶ 6.)

In other words, Plaintiffs admit that Alderson's valuable "information" was also known by "Quorum's district vice president" and "certain [other] Quorum Offi-

cials." Plaintiffs fail to introduce any evidence suggesting that Alderson knew of additional secret information beyond that which was also known by the company's executives.

In short, Plaintiffs have failed to show that Alderson possessed *exclusive* information about Quorum's wrongdoing and that he had the *right to exclude* other individuals from possessing such information. Alderson therefore did not possess a property right in the "know-how" and "information."

## D. Under the More Specific Rules Regarding Trade Secrets, Alderson Did Not Possess a Property Right

Just as Plaintiffs have not identified any property right within the generally accepted definitions of property law, Plaintiffs have likewise failed to show that Alderson possessed a property right under the more specific rules regarding trade secrets. *See Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1011, 104 S.Ct. 2862, 81 L.Ed.2d 815 (1984) (holding that trade secrets are property rights for Fifth Amendment purposes); *Nelson v. Comm'r*, 203 F.2d 1 (6th Cir.1953) (holding that "secret process" or "know-how" was a capital asset);

Plaintiffs repeatedly refer to the relevant information as "secret information and know-how," and insist that the tax caselaw recognizes "secret information and know-how" as a capital asset. (Pls.' Mot. at 9.) Plaintiffs are correct that the caselaw recognizes certain "secret information and know-how" as a capital asset. *See generally* David L. Cameron & Thomas Kittlekamp, *Fed. Income Taxation of Intellectual Property & Intangible Assets* ¶ 4.01 (2009 supp.). Plaintiffs fail to recognize, however, that older cases discussing "secret information and know-how" were discussing the doctrines that are now codified as "trade secrets." Plaintiffs studi-

ously avoided using the term "trade secret," and they make no effort to show that their purported "secret information and know-how" satisfies any relevant body of trade secrets law. However, their arguments and citations require the Court to examine the viability of their arguments under established trade secrets doctrine.

It is important to keep in mind that modern courts no longer use Plaintiffs' terminology of "know-how" and "secret information"; rather, these terms were used by older courts to refer to the law of trade secrets during its formative period. The modern law of "trade secrets" has solidified and superceded the former rules regarding "know-how" and "secret information." *See* 1–1 *Milaram on Trade Secrets* § 1.01[2][a] ("[I]n 1966 the Patent Section of the American Bar Association extensively discussed a resolution to the effect that 'the ABA favors the enactment of a uniform state law to protect against the wrongful disclosure or wrongful appropriation of trade secrets, know-how or other information maintained in confidence by another.'") (quoting National Conference of Commissioners on Uniform State Laws, Recommendation re: Uniform Trade Secrets Protection Act, Feb. 17, 1968). Today, "[t]he words 'trade secrets,' 'know-how,' and 'confidential information' are in fact often used interchangeably, both by parties to agreements and the courts." 1–1 *Milaram on Trade Secrets* § 1.01; *see also* Uniform Trade Secrets Act § 1 cmt. (1985 rev.) ("The words 'method [and] technique' [as used in the Uniform Trade Secrets Act's definition of **trade secret**] are intended to include the concept of '**know-how**.'") (emphasis added); *Restatement (Third) of Unfair Competition* § 39 cmt. d (1995) (describing "**know-how**" as a

type of "**trade secret**") (emphasis added); *Black's Law Dictionary* 950, 1633 (providing cursory definition of "know-how" that cross-references the much lengthier and more elaborate definition of "trade secret"); *Black's* at 881 (defining "intellectual property" as "compris[ing] primarily trademark, copyright, and patent rights, but also includ[ing] **trade-secret rights**, publicity rights, moral rights, and rights against unfair competition") (emphasis added). Accordingly, the Court will address Plaintiffs' arguments about "secret information and know-how" in accordance with trade secrets law.

Generally speaking, the law of trade secrets protects customer lists, chemical formulas, manufacturing processes, and the like—not "secret" information about an ongoing fraud. *See generally* 1–1 *Milaram on Trade Secrets* § 1.09. Indeed, in the definitive trade secrets treatise (which contains more than 180 pages and 700 footnotes devoted solely to illustrating "examples of matters which do or do not qualify as trade secrets"), there is only a single case even discussing the applicability of trade secrets law to a person's knowledge of ongoing wrongdoing. *See id.* at n. 688 (citing *KLM Royal Dutch Airlines, N.V. v. deWit*, 98 Misc.2d 946, 947, 415 N.Y.S.2d 190 (N.Y.Sup.Ct.1979); *see also infra* footnote 12 (discussing *KLM Royal Dutch Airlines* ).)

Here, Plaintiffs have not made a prima facie showing that a trade secret exists. To the extent they argue that Alderson's "know-how" and "information" was a trade secret, Plaintiffs use the following line of analysis: Alderson possessed information; the information was secret; he took steps to preserve its secrecy by filing the lawsuit under seal[9]; the information was only

---

**9.** The False Claims Act requires lawsuits to be filed under seal so that: the Government may investigate the viability of the action while deciding whether or not to intervene. *See*

*American Civil Liberties Union v. Holder,* 652 F.Supp.2d 654, 664 (E.D.Va.2009) (in First Amendment challenge to sealing of False Claims Act complaint, court held that "Con-

valuable to him if it was secret (because otherwise, Alderson would be limited to a 0–10% recovery under the "public source" provision of the False Claims Act); and the information was only valuable to Hospital Corporation if it was secret (because otherwise the Government would bring a lawsuit to recover on the fraud).

 Plaintiffs' argument is misguided. Under all of the relevant bodies of law,[10] there are three basic requirements for establishing a trade secret: (1) there is information (2) which is kept secret by reasonable means and (3) derives economic value from its secrecy. *See* Uniform Trade Secrets Act § 1(4).[11]

 The fundamentally important element is "secrecy"—the information must be the subject of reasonable efforts to maintain secrecy, and it must derive its economic value from that secrecy. Indeed, it is the **secrecy** of the information that permits it to be treated as "property," because secrecy allows the information-holder to exclude others from using that information. *See Monsanto*, 467 U.S. at

1011, 104 S.Ct. 2862 ("With respect to a trade secret, the right to exclude others is central to the very definition of the property interest. Once the data that constitute a trade secret are disclosed to others, or others are allowed to use those data, the holder of the trade secret has lost his property interest in the data."); *DVD Copy Control Ass'n, Inc. v. Bunner*, 31 Cal.4th 864, 881, 4 Cal.Rptr.3d 69, 75 P.3d 1 (2003) ("[P]rohibiting the disclosure of trade secrets acquired by improper means is the only way to preserve the property interest created by trade secret law and its concomitant ability to encourage invention. 'Trade secrets are a peculiar kind of property. Their only value consists in their being kept private.'") (quoting *In re Iowa Freedom of Information Council*, 724 F.2d 658, 662 (8th Cir.1983)).

In the present case, as discussed *supra*, there simply was no "secrecy" regarding Quorum's wrongdoing. Alderson was not the only person who knew about the fraudulent accounting practices: Quorum executives also knew this information. Alderson simply had no means of preventing those

---

gress' central motivation in adding the seal provisions to the FCA was to protect the integrity of ongoing criminal investigations" and that the sealing provision was intended "to give the government ample time to check on the status of any ongoing criminal fraud investigation, coordinate among implicated federal agencies, and make an intelligent decision on intervention.").

**10.** A majority of jurisdictions in the United States (including California, Montana, and Florida), follow the Uniform Trades Secrets Act. *See* Uniform Trades Secrets Act § 1 ("Table of Jurisdictions Wherein Act Has Been Adopted"); Robert L. Haig (ed.), 8 *Business and Commercial Litigation in Federal Courts*, § 88:11, at 240 n. 1 (2d ed.2009 supp.) ("A majority of jurisdictions have adopted some formulation of the Uniform Trade Secrets Act.... The Uniform Act was intended to codify the basic principles of trade secret common law; therefore, legal analysis of a trade secret claim is essentially the same un-

der the Act or the common law.") (citations omitted).

The alternative formulation, contained in the *Restatement (Third) of Unfair Competition*, § 39 (1995), is similar for all material purposes. *See Restatement* § 39 (defining "trade secret" as "any information that can be used in the operation of a business or other enterprise and that is sufficiently valuable and secret to afford an actual or potential economic advantage over others.").

**11.** In full, the Uniform Trade Secrets Act § 1(4) provides: " 'Trade secret' means information, including a formula, pattern, compilation, program, device, method, technique, or process, that: (i) derives independent economic value, actual or potential, from not being generally known to, and not being readily ascertainable by proper means by, other persons who can obtain economic value from its disclosure or use, and (ii) is the subject of efforts that are reasonable under the circumstances to maintain its secrecy."

executives from disclosing this shared information.[12]

In addition, the Court disagrees with Plaintiffs' legal premise that a person can receive trade secret protection for information about ongoing illegal activities. A trade secret only exists if the secret-holder takes *reasonable efforts* to maintain the secrecy of the information. *See* Uniform Trade Secrets Act § (1)(4)(ii). This element simply cannot be satisfied with respect to information about ongoing illegality. There is no objectively "reasonable" method for concealing information about ongoing illegality. Courts have consistently refused to enforce post-employment confidentiality agreements that sought to prevent a former employee from revealing harmful information about the employer's illegality. *See Lachman v. Sperry–Sun Well Surveying Co.*, 457 F.2d 850, 853–54 (10th Cir.1972) (refusing to enforce oil company's confidentiality agreement because it would have the effect of concealing evidence of tortious and/or criminal slant-drilling into competitor's oilfield); *McGrane v. Reader's Digest Ass'n*, 822 F.Supp. 1044, 1052 (S.D.N.Y.1993) ("Disclosures of wrongdoing do not constitute revelations of trade secrets which can be prohibited by agreements binding on former employees."). In the absence of the ability to take "reasonable efforts" to maintain secrecy through confidentiality agreements, there simply cannot be any trade secret about ongoing illegality.

Notably, this conclusion is consistent with the underlying justifications of trade secrets law, which include "[t]he maintenance of standards of commercial ethics." *Kewanee Oil Co. v. Bicron Corp.*, 416 U.S. 470, 481–482, 94 S.Ct. 1879, 40 L.Ed.2d 315 (1974). "Commercial ethics" are not maintained if businesses are able to conceal illegality.

In short, there was no "trade secret" because (1) as a factual matter, Alderson's information was not secret, and (2) as a legal matter, there is no "reasonable" manner in which a person who holds information about ongoing illegality can prevent that information from being disclosed to the public, and thus such information cannot be the subject of trade secret protection.

## E. SUMMARY

In short, Plaintiffs' portion of the recovery against Hospital Corporation was not a "capital asset" for purposes of I.R.C. § 1221 because it was not "property" under any body of law. Because Alderson's did not hold a property interest in the information he exchanged to the Government, his subsequent recovery of $27 million was not a capital gain. Alderson "simply had no property that could be sold or exchanged" for purposes of receiving capital gains treatment. *Trantina v. United States*, 512 F.3d at 573; *see also Miller v. Comm'r*, 299 F.2d at 710–11.

---

**12.** To the extent that a trade secret even existed, it would appear that Quorum, not Alderson, owned that trade secret. In the only authority on point, a New York state trial court held (in a thinly reasoned opinion) that a company's auditor could be enjoined from disclosing information to the media about the company's "various improper payments to individuals in the United States." *KLM Royal Dutch Airlines, N.V. v. deWit*, 98 Misc.2d 946, 947, 415 N.Y.S.2d 190 (N.Y.Sup.Ct.1979).

The court concluded that the secret information "constitute[d] trade secrets of plaintiff [that is, the company]," and that the company was therefore entitled to enjoin the plaintiff from disclosing this information to the media. *Id.*

However, for the reasons discussed *infra*, this Court disagrees with the *KLM Royal Dutch Airlines* court's conclusion that knowledge of wrongdoing may constitute a legally protectable trade secret.

Accordingly, Plaintiffs' income from the False Claims Act award was correctly characterized as ordinary income. Plaintiffs are not entitled to recharacterize their income and obtain a tax refund from the Government.

In light of the fact that Alderson did not possess any legally protectable property interest in the "information" he gave to the Government in exchange for his share of the False Claims Act cause of action, the Court refrains from discussing the parties' remaining arguments regarding the existence of a capital asset and the timing of the sale(s) or exchange(s) of the capital asset.

## V. CONCLUSION

For the foregoing reasons, Defendant's Motion for Summary Judgment is GRANTED and Plaintiffs' Motion for Summary Judgment is DENIED.

IT IS SO ORDERED.