# FOR PUBLICATION

# UNITED STATES COURT OF APPEALS
# FOR THE NINTH CIRCUIT

KELLY SAMSON; SALLY SAMSON;
CHARLES KUHN; SARAH KUHN; JOHN
L. SUTHERLAND; CAROLE D.
SUTHERLAND; THOMAS E. MORGAN,
III; BETH BRYSON MORGAN;
THOMAS E MORGAN CHILDREN'S
TRUST; BLAKELY ROCK HOLDINGS
LLC; A. GARY AMES; BARBARA J.
AMES; A GARY AND BARBARA J.
AMES LIVING TRUST; MARK D.
LAROCHE; TRINA LAROCHE; BLAKELY
PROPERTIES LLC; SAMSON FAMILY
LAND COMPANY, LLC; BLAKELY
HARBOR PROPERTIES LLC,
    *Plaintiffs-Appellants,*

    v.

CITY OF BAINBRIDGE ISLAND,
    *Defendant-Appellee.*

No. 10-35352

D.C. No.
3:05-cv-05197-RJB

OPINION

Appeal from the United States District Court
for the Western District of Washington
Robert J. Bryan, Senior District Judge, Presiding

Argued and Submitted
March 8, 2012—Seattle, Washington

Filed June 15, 2012

6939

Before: Richard A. Paez and Mary H. Murguia,
Circuit Judges, and James S. Gwin, District Judge.*

Opinion by Judge Paez

---

*The Honorable James S. Gwin, United States District Judge for the
Northern District of Ohio, sitting by designation.

## COUNSEL

Averil Rothrock and Aaron Matthew Laing — Schwabe Williamson & Wyatt, PC, Seattle, Washington; and Dennis Reynolds — Law Office of Dennis D. Reynolds, Bainbridge Island, Washington, for the plaintiffs-appellants.

Michael Charles Walter, Amanda Gabrielle Butler, and Randal Wayne Ebberson — Keating Bucklin & McCormack Inc. P.S., Seattle, Washington; and Rod P. Kaseguma, Rosemary A. Larson, and William A Linton — Inslee, Best, Doezie & Ryder, P.S., Bellevue, Washington, for the defendant-appellee.

Daniel A. Himebaugh — Pacific Legal Foundation, Bellevue, Washington, for amicus curiae Pacific Legal Foundation.

## OPINION

PAEZ, Circuit Judge:

"Full indeed is earth of woes, and full the sea," remarked Hesiod,[1] and reviewing the long odyssey of Kelly and Sally Samson, we are inclined to agree. The pair own waterfront property in picturesque Blakely Harbor in the City of Bainbridge Island. They devoutly wished to build a pier or a dock on their property during a time when local authorities had imposed a moratorium on such projects. The Samsons and some of their fellow landowners waged a long campaign against the moratorium in the state courts, and ultimately won a judgment declaring that the moratorium violated the state constitution. That victory was a hollow one, however, because the state courts upheld permanent changes to Bainbridge's

---

[1]Hesiod, *Works and Days*, *in* 2 The Library of Original Sources 28 (Oliver J. Thatcher ed., 1901).

shoreline land-use laws that permanently deferred the Samsons' dreams.

The Samsons come now to the federal courts, seeking damages for the thirty-one months during which they were barred from improving their shoreline property by the moratorium on new projects. They assert that the moratorium violated their substantive and procedural due process rights under the Fourteenth Amendment, and seek damages against the city under 42 U.S.C. § 1983. We conclude that the moratorium ordinances were validly enacted, nonarbitrary, and manifestly related to the city's legitimate municipal interests. Accordingly, we hold that the City of Bainbridge Island did not violate the Samsons' constitutional rights, and we affirm.

## Background

Kelly and Sally Samson[2] own waterfront residential property in Blakely Harbor, a bay on the southeast side of Bainbridge Island, in Puget Sound. In Washington, shoreline property like the Samsons' is subject to a regulatory scheme that consists of three parts: (1) the Shoreline Management Act of 1971, Wash. Rev. Code §§ 90.58.10-930, a state statute that provides a basic framework for shoreline management; (2) the Washington Department of Ecology's regulations implementing the Act, *see generally* Wash. Admin. Code tit. 173; and (3) Shoreline Master Programs, which are comprehensive use plans adopted by local jurisdictions and approved by the Department of Ecology, *see* Wash. Rev. Code § 90.58.030(3)(c).

The City of Bainbridge Island ("Bainbridge") adopted a

---

[2]Following the practice of the district court and the litigants, we use "the Samsons" as a metonym for the eighteen natural persons and corporate entities that constitute the Plaintiffs-Appellants in this appeal. All eighteen appellants own residential waterfront property in Blakely Harbor and were affected by the moratorium.

Shoreline Master Program in 1996. In 2000, the Washington Department of Ecology revised its statewide shoreline regulations. State law in effect at the time required Bainbridge to update its Shoreline Master Program to comply with the new regulations within two years of their passage. *See* Wash. Rev. Code § 90.58.080 (West 2000) ("Local governments shall develop or amend, within twenty-four months after the adoption of guidelines as provided in RCW 90.58.060, a master program for regulation of uses of the shorelines of the state consistent with the required elements of the guidelines adopted by the department.").[3] Bainbridge thus began a comprehensive review of its 1996 Shoreline Master Program.

At the prompting of local residents and community associations, Bainbridge considered proposed restrictions on over-water shoreline development, such as private docks and piers. Critics of shoreline development particularly focused on Blakely Harbor. Blakely Harbor is the least developed and most rural of Bainbridge's various harbors, and many residents were keen to preserve its pristine character. Bainbridge's own Harbor Management Plan, adopted by the City Council in 1999, praised Blakely Harbor for its "relatively undeveloped" character, and stated that preventing the proliferation of manmade over-water structures was a "specific goal[ ]" for the city.[4]

---

[3]The state legislature amended the Shoreline Master Program requirements in 2003. The amendments eliminated the requirement that cities update their Shoreline Master Programs within two years of a change to state guidelines, and substituted a county-by-county update schedule. *See* An Act Relating to shoreline management; and amending RCW 90.58.060, 90.58.080, and 90.58.250, ch. 262, 2003 Wash. Laws 1424-25. According to the new schedule, cities in Kitsap County—where Bainbridge Island is located—were required to update their Shoreline Master Programs by December 1, 2011. *See* Wash. Rev. Code § 90.58.080(2)(a)(iii) (West 2004).

[4]Blakely Harbor remains "the last harbor within Central Puget Sound that remains largely undeveloped with docks." *See* City of Bainbridge Island, *2006 Blakely Harbor Dock Shoreline Amendment Fact Sheet* 1 (Aug. 2006), *available at* http://www.ci.bainbridge-isl.wa.us/documents/Blakely_Dock_Fact_Sheet_Aug2006.pdf.

On August 8, 2001, the City Council adopted Ordinance No. 2001-32. The ordinance imposed a moratorium on "shoreline substantial development applications for construction of new docks and piers . . . in Blakely Harbor."[5] The ordinance was passed on an emergency basis and without a public hearing, though a public hearing was held after adoption. The ordinance included prefatory language taking note of the paucity of docks and piers in Blakely Harbor and observing that none had been constructed in the previous thirty years. The ordinance also expressed the City Council's view that the moratorium was "necessary for the protection of the public health, safety, property, or peace."

Two weeks later, the City Council passed Ordinance No. 2001-34, which expanded the scope of the moratorium to apply to permit applications for a broader range of development projects anywhere on the island. The amendment clarified, however, that the moratorium did not apply to permit applications for projects involving preexisting structures, such as maintenance, repair, and restoration projects. The expanded ordinance listed a variety of new justifications for the moratorium. These included the threat that shoreline structures posed to critical shoreline habitat, the need to preserve what little undeveloped shoreline remained on the heavily developed island, and the importance of holding construction activity in abeyance while the city completed the revisions to its Shoreline Master Program.

Six weeks later, the City Council adopted Ordinance No. 2001-45, which narrowed the moratorium so that it applied only to applications for "new overwater structures (piers,

---

[5]Washington law requires that all shoreline development in Washington be consistent with the policy of the Shoreline Management Act and any local shoreline master program. Wash. Rev. Code § 90.58.140(1). To effectuate this requirement, state law provides that any "substantial development" on state shorelines first requires a substantial development permit. *Id.* § 90.58.140(2). The Bainbridge moratorium functioned to prevent residents from filing applications for such permits.

docks and floats) and new shoreline armoring (bulkheads and revetments) where none has previously existed." With Ordinance No. 2001-45, the City Council issued findings of fact that it developed from public testimony and other evidence presented at public hearings held after the passage of Ordinance No. 2001-34. The City Council found, *inter alia*, that shoreline structures such as piers, docks, and bulkheads had the "potential to cause significant impact to critical shoreline habitat" and to adversely affect juvenile salmon populations. The City Council also adopted the estimates of city planners that in the time it would take to revise the Shoreline Master Program, Bainbridge would receive "at least 14 shoreline substantial development permit applications and 29 shoreline substantial development exemption applications" if no moratorium were in effect.

In November of 2001, a group of residents sued Bainbridge in Kitsap County Superior Court, seeking a declaration that the "rolling" moratorium was illegal and void (the "*Biggers* litigation"). *See Biggers v. City of Bainbridge Island*, 169 P.3d 14, 17-19 (Wash. 2007). While the litigation was pending, Bainbridge officials reviewed an environmental assessment and prepared a draft updated Shoreline Master Program. *Id.*

Almost a year later, on August 14, 2002, the City Council adopted Ordinance No. 2002-29, which extended the term of the moratorium to March 1, 2003. The ordinance, which was enacted after a public hearing, provided that the moratorium would last until early 2003. Days before the moratorium expired, the City Council adopted Ordinance No. 2003-13 on an emergency basis, which extended it to September 1, 2003.

Before the second deadline expired, the state superior court issued a decision in the *Biggers* litigation. The court invalidated the moratorium, holding that the city "overstepped its constitutional limits" by failing to exempt structures under

$2,500 and by trenching on the authority of the state Department of Ecology.

Bainbridge appealed to the Washington Court of Appeals. Bainbridge moved to stay the superior court's judgment pursuant to Washington Rule of Appellate Procedure 8.1(b). The Court of Appeals granted the stay.[6] City officials announced in a press release that they would continue to refuse to accept building permit applications for over-water structures during the pendency of the appeal, despite the superior court's judgment. On August 27, 2003—two weeks after the state trial court invalidated the moratorium ordinances—the City Council adopted Ordinance No. 2003-34, which extended the moratorium for Blakely Harbor until March 1, 2004.

Shortly thereafter, the City Council amended the Shoreline Master Program to permanently ban new dock construction in Blakely Harbor. These permanent restrictions were identical to the restrictions in the moratorium, so the amendments to the Shoreline Master Program had the effect of terminating the moratorium. The Washington Department of Ecology approved the permanent modifications to Bainbridge's Shoreline Master Program in early 2004.

After the city amended the Shoreline Master Program, the *Biggers* litigation reached the Washington Supreme Court. A divided court affirmed the superior court's judgment that the rolling moratorium violated the state constitution. *See Biggers*, 169 P.3d at 17. In a separate case two years later, however, the Washington Court of Appeals upheld Bainbridge's permanent amendments to its Shoreline Master Program prohibiting construction of new single-use private docks in Blakely Harbor. *See Samson v. City of Bainbridge Island*, 202 P.3d 334 (Wash. Ct. App. 2009). The Washington Supreme

---

[6]Rule 8.1(b) provides that a stay of a trial court judgment issues as a matter of right if the judgment "affect[s] real, personal or intellectual property."

Court denied review. *Samson v. City of Bainbridge Island*, 218 P.3d 921 (Wash. 2009). Bainbridge's revised Shoreline Master Program thus remains in effect, and continues to protect Blakely Harbor's primeval character.

While the *Biggers* litigation was pending, the Samsons and eight other property owners filed multiple new actions in Kitsap County Superior Court, alleging a variety of state-law claims as well as federal constitutional claims under 42 U.S.C. § 1983. Bainbridge removed the cases to the United States District Court for the Western District of Washington, which consolidated the actions. The Samsons and Bainbridge filed cross-motions for summary judgment on the federal claims. The district court granted summary judgment in favor of Bainbridge, holding that the Samsons had not raised a genuine issue of fact on their equal protection, substantive due process, and procedural due process claims. The Samsons now appeal the adverse summary judgment on their substantive and procedural due process claims only.

The district court had jurisdiction over the Samsons' claims under 28 U.S.C. § 1343(a)(3) and 42 U.S.C. § 1983. We have jurisdiction pursuant to 28 U.S.C. § 1291.

## Discussion

### I.   Substantive due process claim.

A government entity may be held liable under 42 U.S.C. § 1983 if an "action that is alleged to be unconstitutional implements or executes a policy statement, ordinance, regulation, or decision officially adopted and promulgated by that body's officers." *Monell v. Dep't of Soc. Servs.*, 436 U.S. 658, 690 (1978). The Samsons allege that Bainbridge violated their substantive due process rights when it enforced the development moratorium, which was enacted and repeatedly extended by city ordinances. The district court granted summary judgment for Bainbridge on this substantive due process claim.

We review de novo the grant of summary judgment. *See Sharrock v. United States*, 673 F.3d 1117, 1119 (9th Cir. 2012). In this case, there are no disputes about the material facts; the only question is the legal one of whether the district court correctly ruled that Bainbridge did not violate the Samsons' constitutional rights.[7] *See Trantina v. United States*, 512 F.3d 567, 570 n.2 (9th Cir. 2008).

**[1]** "The Fourteenth Amendment prohibits states from 'depriv[ing] any person of life, liberty, or property, without due process of law.' U.S. Const. amend. XIV, § 1. At the threshold, a claim under § 1983 for an unconstitutional deprivation of property must show (1) a deprivation (2) of property (3) under color of state law." *Newman v. Sathyavaglswaran*, 287 F.3d 786, 789 (9th Cir. 2002) (alteration in original). "[P]roperty interests derive not from the Constitution but from 'existing rules or understandings that stem from an independent source such as state law—rules or understandings that secure certain benefits and that support claims of entitlement to those benefits.' " *Gallo v. U.S. Dist. Court*, 349 F.3d 1169, 1178 (9th Cir. 2003) (quoting *Bd. of Regents of State Coll. v. Roth*, 408 U.S. 564, 577 (1972)). "[F]ederal constitutional law," however, "determines whether that interest rises to the level of a legitimate claim of entitlement protected by the Due Process Clause." *Memphis Light, Gas & Water Div. v. Craft*, 436 U.S. 1, 9 (1978) (internal quotation marks omitted).

---

[7]The only disputed question of fact is whether any of the Appellants in this case applied for a shoreline development permit during the time the moratorium was in effect. Bainbridge claims that none did, and the city implies—though it does not argue outright—that, by consequence, the Samsons lack standing to bring this suit. The Samsons aver, however, that during the moratorium period, they attempted to submit a prepared dock application to the proper authorities at City Hall, but were rebuffed by city employees. Because the Samsons were injured by the city's refusal to consider their permit application, and so have standing to bring their constitutional claims, we need not decide whether any Appellant would have standing if the Samsons had not attempted to file a permit application.

The parties dispute whether the Samsons have a property interest sufficient to support their § 1983 claims. Bainbridge argues that the property right the Samsons assert is merely the "abstract need or desire to construct private, single-use docks on Blakely Harbor." Appellee's Opening Br. 30. The Samsons, on the other hand, insist that their property interest is grounded firmly in Washington's "vested rights doctrine," an unusual legal rule that gives Washington residents who apply for building permits a vested right to have their application processed according to the zoning and building ordinances prevailing at the time of the application. *See West Main Assocs. v. City of Bellevue*, 720 P.2d 782, 785 (Wash. 1986).

We need not determine whether the Samsons had a cognizable property interest, whether emanating from the vested rights doctrine or from some more fundamental source. Because even assuming that the Samsons did have such a property interest, we conclude that Bainbridge did not violate the Samsons' substantive due process rights.

**[2]** As the Samsons concede, the moratorium did not impinge on their fundamental rights. *See Jackson Water Works, Inc. v. Pub. Utils. Comm'n*, 793 F.2d 1090, 1093 (9th Cir. 1986) (noting that government action that "affects only economic" interests does not implicate fundamental rights). "The Supreme Court has 'long eschewed . . . heightened [means-ends] scrutiny when addressing substantive due process challenges to government regulation' that does not impinge on fundamental rights." *Shanks v. Dressel*, 540 F.3d 1082, 1088 (9th Cir. 2008) (alterations in original) (quoting *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 545 (2005)). Hence, to establish a substantive due process violation, the Samsons must show that Bainbridge's ordinances establishing and extending the moratorium were "clearly arbitrary and unreasonable, having no substantial relation to the public health, safety, morals or general welfare." *Kawaoka v. City of Arroyo Grande*, 17 F.3d 1227, 1234 (9th Cir. 1994) (internal quotation marks omitted). The ordinances are "presumed

valid, and this presumption is overcome only by a clear showing of arbitrariness and irrationality." *Id.* (internal quotation marks omitted). The Samsons have not met this "exceedingly high burden." *Shanks*, 540 F.3d at 1088 (internal quotation marks omitted).

The Samsons do not seriously dispute that Bainbridge had legitimate interests in protecting wildlife and preserving the development status quo as it prepared to update the Shoreline Master Program. Instead, they argue that Bainbridge's conduct was arbitrary and unreasonable because: (1) the city used a rolling development moratorium in lieu of existing alternative regulatory mechanisms; (2) the city continued to extend the moratorium without making progress toward comprehensively updating its Shoreline Master Program; (3) the city extended the moratorium even after the Kitsap County Superior Court declared the enacting ordinances invalid under the state constitution; and (4) the Washington Supreme Court held that the rolling moratorium violated the state constitution in the *Biggers* litigation.

**[3]** None of these rises to the level of "egregious official conduct." *Id.* ("When executive action like a discrete permitting decision is at issue, only egregious official conduct can be said to be arbitrary in the constitutional sense: it must amount to an abuse of power lacking any reasonable justification in the service of a legitimate governmental objective.") (internal quotation marks omitted). First, the choice of a moratorium as the favored policy mechanism for regulating development was nonarbitrary. As the Supreme Court has recognized in its regulatory takings cases, "moratoria, or 'interim development controls' as they are often called, are an essential tool of successful development." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 338 (2002). Bainbridge's own findings of fact reflect why this is so: when regulatory changes are pending, cities typically receive an increased volume of applications from landowners

seeking to be subject to the existing regime.[8] In light of the city's intention in 2001 to revise its Shoreline Master Program, the policy choice of a development moratorium seems not just nonarbitrary, but positively sensible.

The Samsons' second argument is that Bainbridge's excuse that it needed time to revise the Shoreline Master Program was pretextual. They point out that Bainbridge did not modify the Shoreline Master Program until after the superior court declared the moratorium unlawful, and further observe that Bainbridge abandoned the planned comprehensive update of the Shoreline Master Program in favor of a standalone amendment applicable only to Blakely Harbor. Bainbridge replies that it continued to work on the comprehensive Shoreline Master Program update throughout the moratorium period.

[4] We are not persuaded that the process of revising the Shoreline Master Plan was a ruse designed to justify the arbitrary deprivation of the property rights of Blakely Harbor residents. The Samsons have no concrete evidence that the city was dilatory in updating the Shoreline Master Program, or was using the updating process as a pretext for some more malicious objective. Further, the law at the time required the city to update the Shoreline Master Program, *see* Wash. Rev. Code § 90.58.080 (West 2000), and the Bainbridge City Council did ultimately adopt permanent amendments. And the

---

[8]This problem is surely exacerbated by Washington's vested rights doctrine, which creates an additional incentive to vest a permit application before regulatory changes take effect. The Samsons make great hay of the fact that the city's "admitted objective" in passing the moratorium was to prevent the Samsons from vesting their development rights. But that is precisely the point: a moratorium was the only mechanism that allowed Bainbridge to revise its Shoreline Master Program without triggering a vesting stampede by landowners concerned about new restrictions—one that could have obviated any regulatory changes before they took effect. *Cf. Tahoe-Sierra*, 535 U.S. at 339 ("To the extent that communities are forced to abandon using moratoria, landowners will have incentives to develop their property quickly before a comprehensive plan can be enacted, thereby fostering inefficient and ill-conceived growth.").

fact that the prohibitions on development in Blakely Harbor were ultimately the only changes the city made to the Shoreline Master Program is hardly proof that Bainbridge was merely going through the motions of a comprehensive update. Development regulations in Blakely Harbor may well have been the central issue in the comprehensive update process.

Third, the Samsons argue that Bainbridge acted egregiously and arbitrarily when it voted to extend the moratorium several weeks after the state superior court had declared it invalid. The Samsons compare Bainbridge's actions to those of the Billings, Montana city council in *Bateson v. Geisse*, 857 F.2d 1300 (9th Cir. 1988). In *Bateson*, the city council voted not to issue a building permit even though the applicant had satisfied all the requirements for the permit. *Id.* at 1302. It did so in spite of the city attorney's warning that the decision would almost certainly be overturned in court and would expose the city to substantial civil liability. *Id.* We held that the city council's vote was an "arbitrary administration of the local regulations, which single[d] out one individual to be treated discriminatorily" and constituted a deprivation of substantive due process. *Id.* at 1303.

Bainbridge's promulgation of the development moratorium was nothing like the city council's denial of a building permit in *Bateson*. The city council's action in *Bateson* was an idiosyncratic decision about an individual permit-seeker; the council ignored the city attorney's advice and denied a permit to which the applicant was legally entitled. Here, by contrast, Bainbridge's attorneys were convinced that the moratorium was legal under state law and that the superior court had erred in striking it down. More to the point, Bainbridge sought and obtained a stay of the superior court's judgment. It had good reason to pursue a stay: lifting the moratorium during the pendency of the appeal would have sparked a wave of ad hoc development before the state court of appeals had the opportunity to review the superior court's judgment.

**[5]** The Bainbridge City Council obtained a stay of the adverse judgment, continued to enforce the moratorium, and pursued an appeal. These actions were nothing like the "arbitrary administration of the local regulations" that we decried in *Bateson*. *Id.*

Finally, the Samsons argue that the Washington Supreme Court's judgment that the moratorium violated the state constitution suffices to establish that Bainbridge is liable under § 1983. It is axiomatic, however, that not every violation of state law amounts to an infringement of constitutional rights. *See Paul v. Davis*, 424 U.S. 693, 700 (1976). "Unless there is a breach of constitutional rights, . . . § 1983 does not provide redress in federal court for violations of state law." *Schlette v. Burdick*, 633 F.2d 920, 922 n.3 (9th Cir. 1980); *see also Couf v. DeBlaker*, 652 F.2d 585, 590 n.11 (5th Cir. 1981) ("The plaintiffs seem to urge that the defendants' violation of Florida [zoning] law provides a predicate for § 1983 recovery. The state court litigation established such a violation, but not every infraction of state law constitutes interference with a constitutionally protected interest.").

**[6]** The *Biggers* litigation presented only state-law issues. *See Biggers*, 169 P.3d at 17. The state supreme court concluded that the moratorium "disregards article XVII, section 1 of the Washington Constitution"; it neither considered nor decided federal claims. *Id.* (Indeed, the state-law claims at issue in *Biggers* are not even analagous to the due process claims we consider here.) The case is therefore wholly inapposite to our analysis.[9]

---

[9]For this reason, we do not express a view on whether any of the positions expressed by the three opinions in *Biggers* represents the views of a five-justice majority of the Washington Supreme Court. The parties, and one *amicus*, argue at length about what, if any, precedential holding can be extracted from *Biggers*. Because it is of no moment to this appeal, we reserve that question for the Washington courts.

**[7]** We conclude that the Samsons have failed to plead or present sufficient evidence to allow their substantive due process claim to proceed to trial. None of the conduct they describe was arbitrary in the constitutional sense. At a minimum, it is "at least fairly debatable" that Bainbridge furthered its legitimate interest in orderly, environmentally protective shoreline development by instating a moratorium on new over-water projects. *See Halverson v. Skagit Cnty.*, 42 F.3d 1257, 1262 (9th Cir. 1994) (internal quotation marks omitted).

## II.   Procedural due process claim.

The district court also granted summary judgment to Bainbridge on the Samsons' procedural due process claim. Because the Bainbridge City Council used validly enacted ordinances to impose and extend the moratorium, we affirm.

**[8]** "Ordinarily, due process of law requires an opportunity for 'some kind of hearing' prior to the deprivation of a significant property interest." *Memphis Light*, 436 U.S. at 19 (citing *Boddie v. Connecticut*, 401 U.S. 371, 379 (1971)). "However, '[w]hen the action complained of is legislative in nature, due process is satisfied when the legislative body performs its responsibilities in the normal manner prescribed by law.'" *Halverson*, 42 F.3d at 1260 (alterations in original) (quoting *Sierra Lake Reserve v. City of Rocklin*, 938 F.2d 951, 957 (9th Cir. 1991)).

**[9]** The City Council's enactment of the various moratorium ordinances were lawful legislative acts, because the ordinances applied generally to all owners of shoreline property on Bainbridge Island (or later in Blakely Harbor).[10] *See id.* at

---

[10]Even the first moratorium ordinance, which was adopted on an emergency basis prior to a public hearing, was a legislative act. *See Kuzinich v. Cnty. of Santa Clara*, 689 F.2d 1345, 1349-50 (9th Cir. 1982) (holding that the enactment on an emergency basis of a zoning scheme of general applicability was a legislative act).

1261 (explaining that "governmental decisions which affect large areas and are not directed at one or a few individuals" are legislative in nature). Nothing in the record suggests that the City Council adopted the various ordinances in an unlawful manner, and the Samsons do not assert that Bainbridge failed to provide adequate notice of or forums for public hearings.

**[10]** Procedural due process entitles citizens to a legislative body that "performs its responsibilities in the normal manner prescribed by law." *Id.* at 1260 (internal quotation mark omitted). The Bainbridge City Council hewed to its ordinary protocols when it passed the moratorium ordinances. The Samsons' rights were thus "protected in the only way that they can be in a complex society, by their power, immediate or remote, over those who make the rule." *Bi-Metallic Inv. Co. v. State Bd. of Equalization*, 239 U.S. 441, 445 (1915).

## Conclusion

It is surely vexing to the Samsons that they and their co-plaintiffs successfully challenged the moratorium in state court, but received no damages for their efforts. And it must be more vexing still that they won the battle, but lost the war: the state courts struck down the temporary moratorium, but upheld the permanent ban on shoreline development. But the federal courts do not exist to satisfy litigants who are unhappy with what they received in state court. Nor do they exist to second-guess the manner in which city officials promote the public welfare. Because the Samsons have suffered no violation of their constitutional rights to substantive and procedural due process, the district court's order granting Bainbridge's motion for summary judgment is

**AFFIRMED.**